[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-15525
Non-Argument Calendar
_____

D.C. Docket No. 6:13-cr-00304-JA-GJK-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

WILLIAM A. WHITE,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(June 30, 2016)

Before MARTIN, JULIE CARNES, and ANDERSON, Circuit Judges.

PER CURIAM:

Defendant William White sent emails and posted messages online threatening to kidnap, rape, and murder Florida state officials—Walter Komanski, Lawson Lamar, Kelly Boaz, and their spouses, children, and grandchildren—with the intent to extort these officials into dismissing state charges against members of a white supremacist organization known as the American Front. Walter Komanski was a judge in the Ninth Judicial Circuit in Florida and had signed the arrest warrants for the American Front members; Lawson Lamar was the State's Attorney in the Ninth Judicial Circuit at the time of the arrests; and Kelly Boaz was the case agent assigned to the American Front investigation.

Defendant was charged with five counts of extortion by interstate communications, in violation of 18 U.S.C. § 875(b), for sending three emails containing extortionate threats (Counts 1-3), and for posting the extortionate threats on the websites of the Southern Poverty Law Center and the Anti-Defamation League (Counts 4-5).

Defendant pleaded not guilty and proceeded to trial. At the close of the Government's case-in-chief, and again at the close of the Defendant's case, Defendant moved for judgment of acquittal. The district court denied the motion, and a jury convicted Defendant on all counts.[1] The district court subsequently

---

[1] White was also charged with and convicted of identity theft, in violation of 18 U.S.C. §§ 1028(a)(7) and 2, but at the sentencing hearing, the district court granted his motion for judgment of acquittal on this count.

sentenced Defendant to 210 months' imprisonment, which reflected a 59-month upward variance from the top of Defendant's guideline range. Defendant now appeals his convictions and sentences. After careful review, we affirm.

## I. BACKGROUND[2]

According to the trial evidence, while Defendant was on federal probation in the Western District of Virginia, he absconded with Sabrina Gnos to Mexico in early-May 2012. On the car ride from Roanoke, Virginia, to Mexico, Defendant and Gnos stopped at places such as Starbucks and McDonald's because Defendant wanted to use the free internet. Although Defendant did not permit Gnos to bring any electronics, he brought along a Toshiba laptop computer and used it to send emails and talk to people on Facebook. During the trip, Defendant and Gnos talked about Charles Manson and they listened to the Beatles song "Helter Skelter." Defendant also told Gnos about a software program called TOR, which allows an individual to mask the location of his internet IP address so that the Government cannot find the geographic location of that individual.

Prior to leaving the United States, Defendant had asked Gnos to take care of his affairs while he was out of the country. As a result, he added her to his bank account and provided her with the key to his post office box. Accordingly, after

---

[2] The following facts are taken from the trial, viewed in the light most favorable to the Government. *United States v. Wright*, 392 F.3d 1269, 1273 (11th Cir. 2004).

3

the two arrived in Mexico, Defendant gave Gnos money to drive his car back to Virginia. He also asked her to mail several packages along the way. Gnos mailed the items when she got back to Virginia.

On May 11, 2012, Judge James C. Turk (a now-deceased judge from the United States District Court for the Western District of Virginia who had presided over an unrelated federal case involving Defendant) received a package at his home address that had a return address from Tom Bondurant (the Assistant U.S. Attorney who prosecuted the unrelated federal case against Defendant). The package contained a book written by Defendant entitled "The Centuries of Revolution," and a handwritten message stating, "Be glad it's just a book, pig." On the same day, Bondurant, and his supervisor, Timothy Heaphy (the United States Attorney for the Western District of Virginia), also received packages that contained Defendant's book, as well as handwritten messages.

On May 18, 2012, at 10:21 A.M., the email address, "nslf_helterskelter@hotmail.com," was created. Approximately ten minutes later, the nslf_helterskelter@hotmail.com email address was used to send a threat directed at Judge Turk, which demanded the termination of the legal proceedings against Defendant. Almost immediately after that email was sent, the Facebook account for the username, "Bill White," posted the text of the threat directed at Judge Turk.

The next day, at 2:03 P.M., the Bill White Facebook account posted a request for information pertaining to the names of the judges, federal prosecutors, and FBI agents involved in the American Front case.  The Bill White Facebook account later wrote that the state officials involved in the American Front case were Judge Komanski, Lawson Lamar, and Boaz.

A short time thereafter, the Bill White Facebook account posted a photo of Lawson Lamar's family and listed the names of Lamar's wife, adult children, and grandchildren.  Then, approximately thirty minutes later, Lawson Lamar received an email from nslf_helterskelter@hotmail.com, which is the subject of Count 1.  The email stated in relevant part:

> Okay PIGS.  DIG THIS and DIG IT WELL:
>
> This is JOE TOMASSI, CHARLES MANSON AND SON OF SAM talking to YOU all at once and telling what is gong [sic] to go down.
>
> We are at your houses, we are at your kids houses we are at your grandkids houses and we are sitting outside their schools.  Don't believe me?  Here you are pigs, here you are:
>
> Kelly J Boaz
> [redacted address]
> Sanford, FL [redacted]
>
> Lawson Lamar
> [redacted address]
> Winter Park, FL [redacted]
>
> Walter G Komanski
> [redacted address]
> Orlando, FL [redacted]

5

. . .

You have arrested FOURTEEN RIGHTEOUS BROTHERS AND SISTERS with the AMERICAN FRONT organization.  Monday morning, you are going to go to work and you are going to drop all state charges against them and LET THEM GO.  AND BY THEM, WE MEAN:

. . .

IF YOU DO NOT COMPLY WITH THIS ORDER, we are going to grab your grandchildren Lawson Lamar—[names redacted]—from school and we are going to FUCK THEM WITH KNIVES.  Then, we are going to CUT THEIR FUCKING HEADS OFF and leave them in a COOLER OUTSIDE YOUR OFFICE, and with the BUCKET OF BLOOD WE WILL PAINT PIG ON YOUR WALLS.

Don't believe us?  We just CREEPY CRAWLED the home of JAMES C TURK for the righteous brother WILLIAM A WHITE and we will CREEPY CRAWL ALL OVER YOUR ASS LIKE POISON SPIDERS.

YOU MADE A DEAL WITH THE DEVIL TO BE WHO ARE AND THE DEVIL HAS COME TO COLLECT.

YOURE A KILLER KELLY—AND YOU ARE NEXT. KOMANSKI AND LAMAR—THE PACT YOU ALL MADE, THE PRICE THAT YOU ALL PAID, THE CHANCE YOU CHOSE TO TAKE, THE CHOICE YOU CHOSE TO MAKE.

THE DEVIL is coming FOR HIS DUE.  And when he comes, there WILL BE BLOOD.

/s/

NATIONAL SOCIALIST LIBERATION FRONT—HELTER SKELTER BRIGADE

6

The following day, May 20, 2012, at 2:35 P.M., the same threatening email directed at Judge Komanski, Lawson Lamar, and Boaz, was sent by the nslf_helterskelter@hotmail.com email address to three different media outlets and to Defendant's personal email address, "dhyphen@yahoo.com." This email is the subject of Count 2. Within minutes of this email being sent, the Bill White Facebook account posted a virtually identical copy of the email to its page.

Shortly thereafter, the Bill White Facebook account posted information about the architecture business of Thomas Lamar, Lawson Lamar's adult son. Within minutes of this post, Thomas Lamar received a threatening email from nslf_helterskelter@hotmail.com at his work address. This email is the subject of Count 3 and stated in relevant part:

> All right pigs, DIG IT:
>
> We tried to speak to speak [sic] to Grand Pa-pa but we don't know that he got it, so we're speaking to you.
>
> You might know me. I was the guy sitting outside your house at [redacted address] this morning in the Blue Ford. You can call me MOTHAFUCKIN CHARLIE MANSON MOTHERFUCKER.
>
> Now PAY ATTENTION:
>
> Grand Pa-pa has kidnapped fourteen RIGHTEOUS BROTHERS AND SISTERS and taken them from their homes and their families. Their names are:
>
> . . .

7

He is going to release ALL OF OUR BROTHERS AND SISTERS on MONDAY MORNING or we are going to grab [name redacted] and [name redacted] from school and FUCK THEM WITH KNIVES, put THEIR HEADS IN A COOLER and drop it off at Grand Pa-pas office.

. . .

Later that day, at 7:22 P.M., an individual identified as "Charlie Fucking Manson" at nslf_helterskelter@hotmail.com attempted to post a copy of the first threat directed at Boaz, Lawson Lamar, and Judge Komanski to a blog managed by the Southern Poverty Law Center (Count 4). Minutes later, an individual who was once again identified as "Charlie Fucking Manson" posted the threat on the website for the Anti-Defamation League (Count 5).

Several days passed, and then on May 28, 2012, the Bill White Facebook account wrote that Florida officials had not yet complied with the demand to release the American Front prisoners. The next day, the Bill White Facebook account posted that the federal government was "exhausting their limited bodyguard budget protecting the homes of the three Florida officials involved and their children/grandchildren. So, as noted, political terror is working pretty well to resolve a situation that could not have been resolved peacefully or legally." On June 2, 2012, a link was shared by the Bill White Facebook account, which included a caption containing Boaz's home address, Judge Komanski's home address, and Lawson Lamar's home address, as well as the names of Lawson

8

Lamar's adult children and grandchildren.  The caption also stated, "Are we going to let them have a monopoly on violence or are we going to stop this injustice?"  In the subsequent days, the Bill White Facebook account continued to make various other posts.

Defendant was arrested in Mexico on June 8, 2012.  After this date, the activity on the Bill White Facebook account stopped, as well as all outgoing communications from Defendant's personal email account dhyphen@yahoo.com.

Following a five-day trial, the jury convicted Defendant of five counts of extortion by interstate communications, in violation of § 875(b).  In anticipation of sentencing, the probation officer prepared a Presentence Investigation Report ("PSR").  The PSR grouped Counts 1, 2, 4, and 5 together pursuant to U.S.S.G. § 3D1.2(b), but grouped Count 3 separately because it involved different victims.  As to both groups, the PSR assigned Defendant a base offense level of 18, pursuant to U.S.S.G. § 2B3.2(a).  Defendant also received several enhancements and adjustments, including (1) a three-level enhancement because the offense involved preparation or ability to carry out a threat of death, serious bodily injury, or kidnapping under U.S.S.G. § 2B3.2(b)(3)(B) and (2) a two-level adjustment under U.S.S.G. § 3A1.1(b)(1) because Defendant knew or should have known that the victim was vulnerable.

Pursuant to U.S.S.G. § 3D1.4, Defendant received a multiple-count adjustment of two levels, which resulted in a total offense level of 32. Because Defendant had 11 criminal history points, the PSR assigned him a criminal history category of V. Based on a total offense level of 32 and a criminal history category of V, Defendant's guideline range was 188 to 235 months' imprisonment.

Defendant raised several objections to the PSR. He objected to the two-level adjustment under § 3A1.1(b)(1) for threatening a vulnerable victim, and the three-level enhancement under § 2B3.2(b)(3)(B) for the preparation or ability to carry out the threat.

At sentencing, the district court sustained an objection not relevant to the present appeal and overruled Defendant's other objections. Having sustained one of Defendant's objections, the district court re-calculated Defendant's amended guideline range as 151 to 188 months, based on a total offense level of 30 and a criminal history category of V.

Defendant requested that the district court impose the sentence to run concurrently with the 92-month sentence he had received in the Western District of Virginia for making extortionate threats to his ex-wife while he was on the run in Mexico. After considering the parties' arguments and the 18 U.S.C. § 3553(a) factors, the district court explained that an upward variance was necessary in this case to comply with the § 3553(a) factors given Defendant's criminal history, his

10

conduct leading up to the charges in the present case, the need to protect the public from Defendant, and Defendant's inability to be rehabilitated. Consequently, the district court imposed a 210-month sentence on each count to run concurrently, but ordered the 210-month sentence to run consecutive to the 92-month sentence Defendant received in the Western District of Virginia. This appeal followed.

## II. DISCUSSION

### A.    Sufficiency of the Evidence

Defendant first argues that the evidence was not sufficient to convict him of extortion by interstate communications pursuant to 18 U.S.C. § 875(b). In particular, he asserts that the Government did not provide sufficient proof to identify him as the person who allegedly sent the extortionate threats.

We review *de novo* whether the evidence was sufficient to sustain a criminal conviction. *United States v. Jiminez*, 564 F.3d 1280, 1284 (11th Cir. 2009). In reviewing the denial of a motion for judgment of acquittal, we view the evidence in the light most favorable of the jury's verdict. *Id.* The evidence will be sufficient to sustain a conviction if a reasonable trier of fact could find that it established the defendant's guilt beyond a reasonable doubt. *Id.* at 1284–85. When the Government relies on circumstantial evidence, the conviction must be supported by reasonable inferences, not mere speculation. *United States v. Friske*, 640 F.3d 1288, 1291 (11th Cir. 2011).

11

To convict a defendant of extortion under 18 U.S.C. § 875(b), the Government must prove that the defendant (1) transmitted a communication in interstate commerce (2) containing any threat to kidnap or injure the person of another (3) with the intent to extort any money or other thing of value.  18 U.S.C. § 875(b).  Here, the evidence presented at trial was sufficient to support Defendant's convictions for extortion by interstate communications.  Based on the evidence presented by the Government, a reasonable jury could find that Defendant sent the threats to kidnap or seriously injure another person through interstate commerce with the intent to extort a thing of value.[3]

A reasonable jury could infer that Defendant sent the threatening emails and made the online posts using the nslf_helterskelter@hotmail.com email address. "NSLF" stands for the National Socialist Liberation Front and is a defunct neo-Nazi group that was founded in the 1960's by individuals who worked for the American Nazi Party.  The Bill White Facebook account "liked" the National Socialist Liberation Front's Facebook page and posted a manifesto for the group two days after the nslf_helterskelter@hotmail.com email address was created. Heidi Beirich—director of the Southern Poverty Law Center's Intelligence Project, which produces a magazine and a blog that tracks publications about extremist

---

[3]  On appeal, Defendant does not challenge the sufficiency of the evidence pertaining to whether the communications contained threats to kidnap or seriously injure the person of another, nor does he dispute that the communications traveled in interstate commerce.  Thus, he has abandoned any challenge related to those arguments. *See United States v. Cunningham*, 161 F.3d 1343, 1344 (11th Cir. 1998).

groups—testified that she was familiar with Defendant because of his involvement with the neo-Nazi movement.  In fact, the Southern Poverty Law Center had written repeatedly about Defendant's activities in various hate groups, including the group that he created—The American Nationalist Socialist Worker's Party.

Moreover, the nslf_helterskelter@hotmail.com email address was used to send a threat directed at Judge Turk (the judge who presided over an unrelated federal case involving Defendant), demanding the cessation of Defendant's criminal proceedings.  Investigators were not able to determine the geographic location of the IP address used to create the nslf_helterskelter@hotmail.com email address because it had been made anonymous.  The Bill White Facebook account, however, had requested information about using "anonymizing" software various times, and Defendant discussed this very software with Gnos on their trip to Mexico.  Likewise, the posts on the Southern Poverty Law Center's blog and the Anti-Defamation League's website were posted by an individual identified as "Charlie Fucking Manson" at nslf_helterskelter@hotmail.com, and Defendant discussed Charles Manson with Gnos and played the Beatles song "Helter Skelter" on the drive to Mexico.

Furthermore, the activity on the Bill White Facebook account was very close in time and content to the threatening emails and website posts.  Indeed, the Bill White Facebook account posted a verbatim copy of the threat directed at Judge

Komanski, Lawson Lamar, Boaz, and their families within minutes of the threat having been emailed to Defendant's personal address, dhyphen@hotmail.com. The Bill White Facebook account also solicited others on social media for the names and addresses of the state and federal officials involved in the American Front prosecution. The Bill White Facebook account later posted the names and addresses of these officials, as well as a photograph of Lawson Lamar's family.

A reasonable jury could infer that Defendant was responsible for the posts on the Bill White Facebook account. At trial, Gnos testified that she saw Defendant using Facebook on their trip to Mexico and identified the Bill White Facebook account as Defendant's account. FBI Special Agent James Majeski also testified that the FBI had connected the Facebook account to Defendant based on several facts, including that the account contained photographs of Defendant. Agent Majeski further testified that the email address used to set-up the Bill White Facebook account, "volund1065@hotmail.com," sent multiple emails in response to an advertisement for a boat ride in early-May 2012. In these emails, the user of the "volund1065@hotmail.com" stated that he was in Mexico and in need of a ride to Panama, and signed the name "Bill" on one of the emails. Moreover, Defendant's personal email address, dhyphen@yahoo.com, was referenced in private conversations on the Bill White Facebook account. And notably, the activity on the Bill White Facebook account, as well as outgoing communications

14

from dhyphen@yahoo.com ended on June 8, 2012—the day Defendant was arrested in Mexico.

We are not persuaded by Defendant's speculation that someone else could have used his account in an attempt to frame him. Gnos testified that although she had access to his bank account and post office box, Defendant had not given her his internet passwords and usernames. In light of the jury's verdict, the jury found her to be credible, and we therefore defer to that determination. *See Jiminez*, 564 F.3d at 1285; *see also United States v. Thompson*, 422 F.3d 1285, 1290–91 (11th Cir. 2005) (stating that we accept all credibility choices made in the Government's favor unless they are incredible as a matter of law).

Moreover, the fact that Agent Majeski testified that the user information for the nslf_helterskelter@hotmail.com email address stated that a female created it in Roanoke, Virginia, is of no consequence because Agent Majeski also explained that this information is personally entered by the user. Therefore, the user can identify himself as any gender he wishes and state that the email address was created in any place that he wishes. And while the Bill White Facebook account did make various posts stating that it had been hacked, it never made any posts disavowing the comments made about the Florida officials involved in the American Front prosecution. Similarly, although defense witness Richard Connor, a computer forensic analyst, testified that his analysis of the dhyphen@yahoo.com

email account showed that an attachment to one email contained a Trojan horse application—that, if activated, could steal data or otherwise obtain a user's passwords—Connor also stated that he did not know if the Trojan horse application was actually installed on Defendant's computer.  The above evidence therefore, which Defendant says showed the possibility that someone tried to frame him, does not alter our conclusion that a reasonable trier of fact could conclude beyond a reasonable doubt, that Defendant was guilty.  *See Jiminez*, 564 F.3d at 1285 ("[I]t is not enough for a defendant to put forth a reasonable hypothesis of innocence, because the issue is not whether a jury reasonably could have acquitted but whether it reasonably could have found guilt beyond a reasonable doubt.").

We turn next to Defendant's argument that the evidence was insufficient to show that the threats were made for a thing of value.  Specifically, Defendant contends that the Government did not establish a link between the American Front members and Defendant, such that the release of the American Front members would be of any value to Defendant.  "When a defendant raises specific challenges to the sufficiency of the evidence in the district court, but not the specific challenge he tries to raises on appeal, we review his argument for plain error."  *United States v. Baston*, 818 F.3d 651, 664 (11th Cir. 2016).  Because Defendant raised specific

16

challenges to the sufficiency of the evidence before the district court, but did not raise the argument he raises here, our review is limited to plain error.[4]  *Id.*

Even assuming Defendant could show that the district court committed error, he cannot show that the error was plain because he does not cite to, and our research has not revealed, any published decision holding that a defendant must personally benefit from the "thing of value" that is the subject of the extortion under § 875(b).  *See United States v. Lejarde-Rada*, 319 F.3d 1288, 1291 (11th Cir. 2003) ("It is the law of this circuit that, at least where the explicit language of a statute or rule does not specifically resolve an issue, there can be no plain error where there is no precedent from the Supreme Court or this Court directly resolving it.").  In any event, we have interpreted the phrase "any thing of value" in the bribery statute, 18 U.S.C. § 666(a)(1)(B), broadly to mean "quite literally 'any thing whatever; something, no matter what.'"  *Cf. United States v. Townsend*, 630 F.3d 1003, 1010–11 (11th Cir. 2011).  Defendant's Facebook post stating that "political terror" was working to achieve the goal of releasing the American Front prisoners shows that the prisoners' release had value to him.  *See id.*  In short, the district court did not plainly err by failing to *sua sponte* acquit Defendant on the

---

[4]  Under plain error review, we will reverse where there is "(1) an error (2) that is plain and (3) that has affected the defendant's substantial rights; and . . . (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Madden*, 733 F.3d 1314, 1322 (11th Cir. 2013).

17

basis that the release of the American Front members did not have any value to him.

Lastly, Defendant argues that the district court should have struck Gnos's testimony because she appeared impaired to the point that her personal knowledge was not satisfactory under Federal Rule of Evidence 602. In support of this argument, Defendant asserts that Gnos testified inconsistently on direct and cross-examination about the medications that she was taking. Because Defendant did not object to Gnos's testimony before the district court, our review is again limited to plain error. *See Baston*, 818 F.3d at 664.

We conclude that the district court did not err, plainly or otherwise. Rule 602 provides that a witness "may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." *See* Fed. R. Evid. 602. At trial, Gnos testified in significant detail about her relationship with Defendant and about their trip to Mexico, which demonstrated that she had personal knowledge of the events. *See id.* ("Evidence to prove personal knowledge may consist of the witness's own testimony."). Her testimony was also consistent with the other evidence showing that Defendant fled to Mexico and that Judge Turk, Heaphy, and Bondurant received packages containing Defendant's book after Gnos mailed the items Defendant had asked her to send. Thus, the district court did not err plainly, or otherwise, by failing *sua*

*sponte* to strike Gnos's testimony on the ground that she lacked personal knowledge.

In short, viewing all of this evidence in the light most favorable to the Government, a reasonable jury could have found beyond a reasonable doubt that Defendant was guilty of extortion by interstate communications.

### B.    Venue

Defendant next contends that venue was improper in the Middle District of Florida with respect to Counts 4 and 5 (the threats posted on the websites for the Southern Poverty Law Center and the Anti-Defamation League). Because the Southern Poverty Law Center is located in Alabama, the Anti-Defamation League is located in New York, and the Hotmail servers are not located in Florida, Defendant contends that the threatening statements alleged in Counts 4 and 5 did not travel through Florida. As such, he asserts that he was entitled to judgment of acquittal on this basis, as well as a jury instruction on venue.

At the close of evidence, Defendant moved for judgment of acquittal as to Counts 4 and 5, on the basis that the Government had not proven venue to be in the Middle District of Florida. Defendant also requested a jury instruction on venue. The district court determined that Defendant's objection to venue was not timely raised. However, even if the issue were timely raised, the district court concluded

19

that there was no issue of fact related to venue. Thus, the district court denied Defendant's request to instruct the jury on venue.

Article III of the Constitution provides that the "Trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed." U.S. Const., art. III, § 2, cl. 3. When considering a venue challenge, we review the evidence "in the light most favorable to the government, and make[] all reasonable inferences and credibility choices in favor of the jury verdict when deciding whether the government has proved by a preponderance of the evidence that an offense occurred in the trial district." *United States v. Smith*, 918 F.2d 1551, 1557 (11th Cir. 1990). Nevertheless, with only a limited exception, a defendant waives a challenge to venue if he has failed to raise the issue before trial. That limited exception applies if the defendant does not become aware of the defect until after the Government has presented its case. *See United States v. Roberts*, 308 F.3d 1147, 1151–52 (11th Cir. 2002) (concluding that defendant waived his venue challenge by not raising it until the close of the prosecution's case because defendant was aware of the basis for his objection before the close of evidence).

Defendant did not raise the issue of venue until his motion for judgment of acquittal at the close of the Government's case. He therefore waived this challenge by not timely raising it. *See id.* Further, we need not consider the applicability of the exception because Defendant did not allege in the district court, nor does he

20

assert on appeal, that he only became aware of the basis for his objection after the Government had rested its case. *Id.*

In fact, the indictment stated that the Southern Poverty Law Center was based in Alabama and that the Anti-Defamation League was based in New York. The indictment also stated that the servers that host those websites were not located in Florida, nor were the servers that store, maintain, and transmit email communications for Hotmail accounts. In short, the indictment set out the very information on which Defendant now rests his venue challenge. Therefore, Defendant was necessarily aware of the basis for this challenge prior to trial. That being so, Defendant's argument that venue was improper is without merit. *See id.* Defendant waived his venue challenge, and the district court did not err when it refused to give a venue instruction.

## C.    Jury Instructions

Defendant next challenges two pattern jury instructions given by the court regarding the definition of "true threat" under 18 U.S.C. § 875(b) and reasonable doubt. We review the legal correctness of a jury instruction *de novo*. *United States v. Mintmire*, 507 F.3d 1273, 1292–93 (11th Cir. 2007). We will reverse a conviction on the basis of an improper jury instruction only if "the issues of law were presented inaccurately, or the charge improperly guided the jury in such a substantial way as to violate due process." *Id.* at 1293 (quotations omitted).

21

### 1.    Definition of True Threat under § 875(b)

Defendant asserts that the district court erred by instructing the jury that the definition of "true threat" as it pertains to a violation of § 875(b) requires that a reasonable person would view the communications as a threat.  He contends that the district court should have instead instructed the jury that a violation of § 875 requires proof of a defendant's subjective intent to threaten.

Prior to trial, Defendant objected to the pattern jury instruction, which defines a "true threat" as "a serious threat – not idle talk, a careless remark, or something said jokingly – that is made under circumstances that would lead a reasonable person to believe that the Defendant intended to [kidnap] [injure] another person."  *See* 11th Cir. Pattern Jury Instructions (Criminal Cases), Offense Instruction 30.2 (2010).  In support of his objections, Defendant asserted that the question of whether a "true threat" requires that the speaker have the subjective intent to communicate a threat was at issue in a case currently pending before the Supreme Court.  The district court overruled Defendant's objection and provided the pattern instruction to the jury.

Defendant now argues that the district court's instruction constituted reversible error in light of the Supreme Court's subsequent decision in *Elonis v. United States*, 575 U.S. __, 135 S. Ct. 2001 (2015).  In *Elonis*, the Supreme Court

overturned the defendant's conviction in violation of 18 U.S.C. § 875(c),[5] for

making threatening statements (which took the form of rap lyrics) because the jury

was improperly instructed that in order to convict the defendant, it only needed to

find that a "reasonable person" would have viewed the defendant's

communications as threats. *Elonis*, 135 S. Ct. at 2005–07, 2012. The Court

reasoned that unlike § 875(b), which requires an "intent to extort," § 875(c) lacked

any express mental state. *Id.* at 2008–09. However, the Court explained that, the

fact that a statute does not identify any required mental state does not mean that

one should not exist. *Id.* at 2009. And requiring criminal liability to turn on

whether a reasonable person views a communication as a threat—without

consideration of what the defendant intends—is erroneous because it "reduces

culpability on the all-important element of the crime to negligence." *Id.* at 2011–

12 (quotations omitted).

Contrary to Defendant's contentions, *Elonis* does not call for reversal of

Defendant's conviction for a violation of § 875(b). *Elonis* involved a violation of

§ 875(c), which does not require any mental state on a defendant's part, not

§ 875(b), which requires the mental state of an "intent to extort." *Compare* 18

U.S.C. § 875(b), *with id.* § 875(c). Moreover, in *Elonis*, the Supreme Court was

---

[5] Section 875(c) of Title 18 of the United States Code provides that, "Whoever transmits in interstate or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of another, shall be fined under this title or imprisoned not more than five years, or both." 18 U.S.C. § 875(c).

23

concerned with the fact that under the "reasonable person" standard, a defendant could be convicted of § 875(c) without any awareness that he had done anything wrong. *Elonis*, 135 S. Ct. at 2011–12. Section 875(b), however, requires an "intent to extort," which means that the Government must prove both the existence of the threat and the defendant's intention to extort something of value via the threats. *See* 18 U.S.C. § 875(b); *see also United States v. White*, 810 F.3d 212, 223 (4th Cir. 2016) (defining "intent to extort" under § 875(b) as the "intent to procure something of value through the use of a wrongful threat to kidnap or injure the person of another," which is "wrongful when delivered intentionally").

In the present case, the district court instructed the jury on this mental state by stating that the Defendant could be found guilty of violating § 875(b) if he (1) "knowingly sent a message in interstate or foreign commerce containing a true threat to kidnap any person or injure the person of another" and (2) "the defendant did so with intent to extort money or something else of value to the defendant." In short, Defendant has not demonstrated that the district court erred by giving this instruction.

### 2. Reasonable Doubt

Defendant also asserts that the district court erred by using the pattern jury instruction, which defines "proof beyond a reasonable doubt" to mean "proof so convincing that you would be willing to rely and act on it without hesitation in the

most important of your own affairs." *See* 11th Cir. Pattern Jury Instructions (Criminal Cases), Basic Instruction 3 (2010).

As Defendant readily concedes, "we have repeatedly approved of the definition of reasonable doubt provided in the Eleventh Circuit Pattern Jury Instructions." *See e.g.*, *United States v. James*, 642 F.3d 1333, 1337–38 (11th Cir. 2011). Therefore, Defendant's challenge to the district court's reasonable doubt instruction is without merit.

### D.    Sentence

Defendant raises several arguments on appeal challenging the procedural and substantive reasonableness of his sentence. He challenges the district court's imposition of two enhancements: a two-level vulnerable-victim enhancement and a three-level enhancement based on preparation and ability to carry out the threat. He also argues that the district court erred by running the sentence in the present case consecutive to the 92-month sentence he received in an unrelated case in the Western District of Virginia. Finally, he argues that his total 210-month sentence is substantively unreasonable.

Using a two-step process, we review the reasonableness of a district court's sentence for an abuse of discretion. *United States v. Cubero*, 754 F.3d 888, 892 (11th Cir. 2014). We first look to whether the district court committed any significant procedural error, such as miscalculating the advisory guideline range,

treating the Sentencing Guidelines as mandatory, failing to consider the 18 U.S.C. § 3553(a) factors,[6] selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence. *Id.* Then we examine whether the sentence is substantively reasonable in light of the totality of the circumstances. *Id.* The party challenging the sentence bears the burden of showing that it is unreasonable. *United States v. Pugh*, 515 F.3d 1179, 1189 (11th Cir. 2008).

### 1. The vulnerable-victim enhancement

Defendant asserts that Thomas Lamar was not a vulnerable victim and argues that the district court procedurally erred by applying the two-level vulnerable-victim enhancement under U.S.S.G. § 3A1.1(b)(1). Although the application of § 3A1.1(b) is a mixed question of law and fact that we review *de novo*, the district court's determination of a victim's vulnerability is a factual finding to which we accord "due deference." *United States v. Frank*, 247 F.3d 1257, 1259 (11th Cir. 2001). We will reverse this factual finding only if we conclude that it is clearly erroneous. *Id.*

---

[6] The § 3553(a) factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need for deterrence; (4) the need to protect the public; (5) the need to provide the defendant with needed education or vocational training or medical care; (6) the kinds of sentences available; (7) the Sentencing Guidelines range; (8) pertinent policy statements of the Sentencing Commission; (9) the need to avoid unwarranted sentencing disparities; and (10) the need to provide restitution to victims. 18 U.S.C. § 3553(a).

Here, Defendant sent a threat directly to Thomas Lamar threatening to kidnap, rape, and kill his two daughters if Thomas Lamar's father, the then-State's Attorney for Ninth Judicial Circuit in Florida, did not drop the charges against the members of the American Front organization.  The district court determined that Thomas Lamar was a vulnerable victim because he was targeted due to the young age of his daughters.

Section 3A1.1(b)(1) of the Sentencing Guidelines provides for a two-level increase in a defendant's offense level if "the defendant knew or should have known that a victim of the offense was a vulnerable victim."  U.S.S.G. § 3A1.1(b)(1).  Although Defendant argues that Thomas Lamar cannot be a vulnerable victim because of his age, the Application Notes to § 3A1.1(b)(1) state, in relevant part, that a "'vulnerable victim' means a person  . . . who is unusually vulnerable due to age, physical or mental condition, *or who is otherwise particularly susceptible to the criminal conduct*."  *Id.* § 3A1.1(b)(1), comment. (n.2 (emphasis added)).

Applying due deference, the district court did not clearly err by determining that Thomas Lamar was a vulnerable victim because of his circumstances, namely, his fear for the safety of his young children.  *See United States v. Bradley*, 644 F.3d 1213, 1288 (11th Cir. 2011) (reasoning that a "vulnerable victim" is a person whose vulnerability is essential to the defendant's choice to victimize them and

"that both circumstances and immutable characteristics can render a victim vulnerable"). The threat Defendant sent directly to Thomas Lamar threatening to kidnap, rape, and kill his children exploited Thomas Lamar's concern for the safety of his two young daughters. *Cf. United States v. Villali*, 926 F.2d 999, 1000 (11th Cir. 1991) (holding that the district court did not clearly err in finding that a victim was unusually susceptible to extortion because of his concern for his kidnapped daughter's health and safety). Accordingly, the district court did not err by imposing the two-level vulnerable-victim enhancement.

### 2.    The preparation or ability to carry out the threat enhancement

Defendant argues that the district court erred by applying the three-level enhancement pursuant to § 2B3.2(b)(3)(B) because the Government did not present sufficient evidence showing his preparation or that he had the ability to carry out the threat, given that he was in Mexico at the time he made the threats.

We review *de novo* the district court's interpretation of the Guidelines and its application of the Guidelines to the facts. *United States v. Moran*, 778 F.3d 942, 959 (11th Cir. 2015). We review the district court's factual findings for clear error. *Id.* Section 2B3.2(b)(3)(B) of the Sentencing Guidelines provides for a three-level increase in the defendant's offense level if "the offense involved preparation to carry out a threat of (I) death; (II) serious bodily injury;

28

(III) kidnapping . . . [or] otherwise demonstrated the ability to carry out a threat." U.S.S.G. § 2B3.2(b)(3)(B).

Again, Defendant threatened Boaz, Lawson Lamar, Judge Komanski, and their family members with kidnap, rape, and murder, unless the charges against the members of the American Front were dropped. The district court concluded that Defendant's statements constituted threats of death, injury, and kidnapping, and that Defendant had the ability to carry out the threat because he used the victim's names and addresses.

The district court did not clearly err by concluding that Defendant had the ability to carry out the threat, which is a requirement for the three-level enhancement under § 2B3.2(b)(3)(B). Defendant not only knew the victim's names and addresses, but he went so far as to list the names of Lawson Lamar's grandchildren and to state that he knew they were at school. Defendant's intimate knowledge of the officials and their families demonstrated Defendant's ability to carry out the threat. *See* U.S.S.G. § 2B3.2, comment. (n.6) (indicating that a "threat to kidnap a person accompanied by information showing a study of that person's daily routine" is an example of a defendant's preparation or ability to carry out a threat). Based on this evidence, we find no error in the district court's imposition of the three-level enhancement under § 2B3.2(b)(3)(B).

### 3.    Consecutive Sentence

Defendant argues that the district court erred by imposing his sentence to run consecutive to the 92-month sentence he received in the Western District of Virginia.  He asserts that the sentences should have been imposed to run concurrently pursuant to U.S.S.G. § 5G1.3(b), because both cases involve the same relevant conduct.

During the same time period that Defendant was in Mexico threatening the Florida state officials in the present case, he was also threatening his ex-wife in Virginia with violence in order to get her to make alimony payments to him.  As a result, Defendant was charged in the Western District of Virginia with extortion by interstate communications and sending threats by interstate communications, in violation of 18 U.S.C. § 875(b) & (c).  A jury later convicted Defendant on all charges, and he was sentenced to 92 months' imprisonment.  The district court in the present case ran Defendant's sentence in this case consecutively to that 92-month sentence.

We review *de novo* the application of U.S.S.G. § 5G1.3.  *United States v. Bidwell*, 393 F.3d 1206, 1208–09 (11th Cir. 2004).  We review the imposition of a consecutive sentence for abuse of discretion.  *United States v. Covington*, 565 F.3d 1336, 1346–47 (11th Cir. 2009).

Section 5G1.3(b) of the Sentencing Guidelines provides that if "a term of imprisonment resulted from another offense that is relevant conduct to the instant offense of conviction . . . the sentence for the instant offense shall be imposed to run concurrently to the remainder of the undischarged term of imprisonment." U.S.S.G. § 5G1.3(b)(2). If the other offense does not constitute relevant conduct, however, "the sentence for the instant offense may be imposed to run concurrently, partially concurrently, or consecutively to the prior undischarged term of imprisonment to achieve a reasonable punishment for the instant offense." *Id.* § 5G1.3(d). In other words, it is the sentencing court's call.

The district court did not err by imposing Defendant's sentence in the present case to run consecutively to the 92-month sentence imposed in the Western District of Virginia because Defendant's act of threatening to extort his ex-wife was not relevant conduct to the present offense.[7] Relevant Conduct is defined as "all acts and omissions . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2). "For two or more offenses to constitute part of a common scheme or plan, they

---

[7] We reject the Government's argument that we should review Defendant's challenge to the district court's imposition of a consecutive sentence for plain error. Although Defendant stated during the sentencing hearing that the district court had discretion to impose his sentence to run concurrently or consecutively, he also belabored the point that the sentences should be imposed to run concurrently because the extortionate threats directed toward his ex-wife were relevant conduct to the present offense. *Cf. United States v. Edwards*, 728 F.3d 1286, 1295 (11th Cir. 2013) ("To preserve an argument for appeal, the argument must be raised at the trial court if the party had the opportunity to do so.").

31

must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose or similar *modus operandi*." *Id.* § 1B1.3, comment. (n.9(A) (emphasis added)). Where offenses are not part of the same common scheme or plan, they may be considered part of the same course of conduct "if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." *Id.* § 1B1.3, comment. (n.9(B)).

Although Defendant sent the extortionate threats in both cases from the same laptop while he was on the lam in Mexico, the two offenses involved different victims and had different purposes. *See id.* § 1B1.3, comment. (n.9(A)). The extortionate threats in the present case were directed at Florida state officials in an effort to obtain the release of the American Front prisoners. The extortionate threats in the case from the Western District of Virginia, however, were directed at Defendant's ex-wife in an attempt to obtain money that she allegedly owed to him. Because Defendant's extortion of his wife did not constitute relevant conduct for the present case, the district court here was not required to impose the sentence to run concurrently with the Virginia sentence. *See id.* § 5G1.3(b)(2). Therefore the district court was entirely within its discretion to run the sentences consecutively. *See id.* § 5G1.3(d).

4.    Substantive Reasonableness

Defendant's final argument is that the district court's imposition of an upward variance and its decision to run Defendant's sentence consecutive to his 92-month sentence in the Western District of Virginia is substantively unreasonable.

We disagree.  Although Defendant's 210-month sentence reflected a 59-month upward variance from his guideline range of 151 to 188 months' imprisonment, the sentence was still below the statutory maximum of 20 years' imprisonment.  *See United States v. Gonzalez*, 550 F.3d 1319, 1324 (11th Cir. 2008) (indicating that a sentence well below the statutory maximum is indicative of reasonableness).

Moreover, the district court relied on several of the § 3553(a) factors to support his decision to upwardly vary.  *See United States v. Rosales-Bruno*, 789 F.3d 1249, 1256 (11th Cir. 2015) (concluding that a 60-month upward variance from the top of the guideline range was substantively reasonable where the district court weighed the § 3553(a) factors and provided significant justifications for imposing such a sentence).  In particular, the district court considered the nature and circumstances of the offense, which were so serious and Defendant's potential for striking fear in the jurors so great, that the district court felt it necessary to select an anonymous jury.  The district court also likened Defendant's conduct to

33

terrorism because he used violence and threats to intimidate and coerce others for political purposes. Moreover, Defendant's criminal history, which included several other prior federal convictions for solicitation to commit a crime of violence, witness tampering, and extortion by interstate communications, as well as absconding while on supervised release, demonstrated the need to incapacitate Defendant for a long period of time. As noted by the district court, Defendant's prior conduct indicated that rehabilitation was unlikely and that confinement was the only way to prevent him from continuing to harass, threaten, and intimidate innocent people.

We also reject Defendant's argument that the district court's imposition of consecutive sentences punishes him twice for conduct related to the present offense because the threats directed at the Florida state officials and the threats directed at Defendant's ex-wife were separate and unrelated. Again, the district court acted within its discretion and considered the § 3553(a) factors when it imposed the consecutive sentences. *See* 18 U.S.C. § 3584(b) ("The court, in determining whether the terms imposed are to be ordered to run concurrently or consecutively, shall consider, as to each offense for which a term of imprisonment is being imposed, the factors set forth in section 3553(a).").

In sum, we are not "left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by

34

arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case." *United States v. Irey*, 612 F.3d 1160, 1190 (11th Cir. 2010) (quotation omitted). Accordingly, Defendant has not shown that the district court abused its discretion by imposing a 210-month sentence.

## IV. CONCLUSION

For all of the above reasons, Defendant's convictions and sentences are

**AFFIRMED**.