[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 7, 2009
THOMAS K. KAHN
CLERK

No. 08-14192

_____

D. C. Docket No. 07-00382-CR-T-24EAJ

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JESUS JIMINEZ,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(April 7, 2009)

Before BLACK and MARCUS, Circuit Judges, and QUIST,* District Judge.

_____

* Honorable Gordon J. Quist, United States District Judge for the Western District of
Michigan, sitting by designation.

MARCUS, Circuit Judge:

Jesus Jiminez was convicted in the United States District Court for the Middle District of Florida of various charges concerning the manufacture and distribution of marijuana plants. He now appeals the convictions, arguing that the evidence was insufficient, the district court improperly admitted evidence in violation of the Sixth Amendment Confrontation Clause, and the court abused its discretion in admitting irrelevant and prejudicial evidence. After thorough review, we can find no merit in any of those challenges and, accordingly, affirm.

## I.

Jiminez and four co-defendants, including his brother Jisklif Jiminez ("Jisklif"), were indicted for conspiring to manufacture and possess with intent to manufacture at least 100 marijuana plants, in violation of 21 U.S.C. §§ 841(b)(1)(B)(vii) and 846, manufacturing and possessing with intent to manufacture at least 100 marijuana plants, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, conspiring to possess with intent to distribute at least 50 kilograms of marijuana in violation of 21 U.S.C. §§ 841(b)(1)(C) and 846, and possessing with intent to distribute at least 50 kilograms of marijuana, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, by a federal grand jury on September 20, 2007. On May 5, 2008, Jiminez proceeded to trial and was thereafter found

guilty by a jury on all four counts. The district court sentenced him to a 60 month term of imprisonment, followed by 48 months of supervised release.

The evidence presented by the government at Jiminez's trial included the following: in March 2007, police officers with the Polk County Sheriff's Office began investigating a residence located at 8245 Lake Lowery Road in Haines City, Florida, a "very rural" area, where Jiminez resided with his brother Jisklif. During the investigation, searches of the garbage at the Lake Lowery Road house were conducted on March 26, 2007 and April 2, 2007, and, during both searches, marijuana was found. The police maintained surveillance on the Lake Lowery Road house and observed traffic regularly coming and going from the house, including a vehicle that traveled from the Lake Lowery Road residence to a residence at 1701 Champagne Road in Haines City, Florida. During the surveillance, the police observed the defendant Jiminez enter and leave the Lake Lowery Road residence several times by the back door.

On July 17, 2007, the police knocked on the front door of the Lake Lowery Road house and Jisklif answered. As soon as the door opened, the police could smell marijuana coming from the house. Upon the request of the officers, Jisklif consented to the search of the house and told one of them that there was marijuana growing inside. During the search, the police found a variety of accoutrements

3

used in the manufacture and distribution of marijuana plants, including in the living room "Foodsaver" plastic bags for use with a heat sealer; clippers on the stove, a heat sealer, a pan of marijuana "shake" (the discarded portions of harvested marijuana plants), recently packaged marijuana, and sealed bags of marijuana "buds" in the kitchen; fertilizer and "bloom stimulators" in a closet off the kitchen; and 210 marijuana plants worth approximately $600,000 in two rooms beyond the closet off the kitchen. In addition, the police found two ounces of cut marijuana in one bedroom and a duffle bag full of marijuana ready for distribution in the house's only other bedroom. Indeed, police officers observed that the smell of marijuana coming from the house was "overpowering" and that they could smell it in every room in the house. One officer added that he could smell the marijuana from twenty yards outside the house.

Defendant Jiminez was in the house at the time of the search, and he told the police that, when they knocked, he had been asleep in the northeast bedroom. Detective Harry Seymour questioned Jiminez about his involvement and Jiminez denied any knowledge of marijuana being in the house. Later Detective Wharton also questioned Jiminez and again Jiminez denied any knowledge of the marijuana grow operation. After he questioned Jiminez, Detective Wharton questioned the brother, Jisklif, who said that Jiminez did, in fact, assist him with the marijuana

4

grow operation. Detective Wharton then questioned Jiminez again, and, during this interview, Jiminez changed his story and admitted that he "helped his brother out" with tending and cultivating the marijuana. He explained that he had been ashamed and "felt like he needed to help out" because he had been living with his brother and had not had a job, so he performed "small menial tasks" for his brother.

While the police were knocking on the front door of the Lake Lowery Road house, two men were seen exiting the back door, and two Dodge trucks -- one white and one black -- then left the premises heading north. Police officers followed the vehicles. After the white truck began moving erratically, the police stopped the vehicle and discovered that it was loaded with garbage and yard waste. Meanwhile, the black truck turned and headed south towards Champagne Road. When police stopped the black truck, they found it loaded with 117 pounds of packaged marijuana worth approximately $350,000. Police officers also searched the house at 1701 Champagne Road and found a second marijuana grow operation with about 35 plants.

During extensive cross-examination, defense counsel attempted to impeach Detective Wharton, who, on direct examination, had said that Jiminez confessed to participating in the marijuana grow operation. Defense counsel asked Wharton to

5

confirm that Jiminez had denied any knowledge of the marijuana the first time he spoke to Wharton; to confirm that Wharton had interviewed Jiminez again after he had interviewed Jisklif; to state how long he had interviewed Jisklif; to proffer the details Jiminez had given about the grow house operation during his final interview; to explain why he had not asked Jiminez to sign a written summary of his confession; to explain why he had devoted only one paragraph of the five-page police report to the defendant's confession; and to explain why he had not provided the police report to the prosecution until a week before trial.

Thereafter, on redirect examination, the prosecutor asked Detective Wharton if he recalled defense counsel's questioning him about the defendant's confession. The prosecutor then asked the detective whether Jisklif had given him any indication of the defendant's role in the operation before he re-questioned Jiminez. Defense counsel objected on hearsay grounds; the district court overruled the objection. Wharton then testified that Jisklif had "said that [Jiminez] was living with him and that he was helping him with the marijuana plants." Wharton explained: "[t]hat's why we went back and interviewed [Jiminez] a second time because, after the first time, we took him at his word, until his brother indicated otherwise, and then we went back and asked him again."

The prosecutor also called Detective Edward Holler who testified that the

6

Champagne Road house contained a marijuana grow operation similar to the one at the Lake Lowery Road house. Finally, the prosecutor called Tampa Electric Company electricity theft investigator Steve Gupton who testified that, based upon the alteration of the wiring in the Lake Lowery Road house, the Lake Lowery Road house had been stealing electricity consistent with the operation of a grow house since at least October 2006.

The defendant took the stand in his own defense, testifying that he was a native and citizen of Cuba who had arrived in the United States on March 28, 2007 at the Texas border and had been granted permission to lawfully enter. Jiminez said he then traveled from Texas to Haines City, Florida to live with his brother Jisklif at the Lake Lowery Road house. He observed that he had not had access to the closet off the kitchen, to the two rooms extending beyond that closet, or to the garage, that each of those spaces had been locked and partitioned from the rest of the house, and that he had never seen nor smelled any marijuana at the Lake Lowery Road house. Finally, he denied helping his brother with the marijuana grow operation or, indeed, ever telling Detective Wharton that he had participated in the operation. The jury plainly disbelieved the defendant and convicted him.

This timely appeal followed.

7

## II.

We review <u>de novo</u> whether there is sufficient evidence in the record to support a jury's verdict in a criminal trial, viewing the evidence in the light most favorable to the government, and drawing all reasonable factual inferences in favor of the jury's verdict. <u>United States v. Williams</u>, 144 F.3d 1397, 1401 (11th Cir. 1998). Accordingly, the evidence will be sufficient to support a conviction if "a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt." <u>United States v. Calhoon</u>, 97 F.3d 518, 523 (11th Cir. 1996). In rebutting the government's evidence "[i]t is not enough for a defendant to put forth a reasonable hypothesis of innocence, because the issue is not whether a jury reasonably could have acquitted but whether it reasonably could have found guilt beyond a reasonable doubt." <u>United States v. Thompson</u>, 473 F.3d 1137, 1142 (11th Cir. 2006). Finally, we assume that the jury made all credibility choices in support of the verdict. <u>Id.</u>

The evidence presented was sufficient to enable the jury to find Jiminez guilty beyond a reasonable doubt.

Jiminez is correct in observing "that close association with a co-conspirator or mere presence" at the scene of the illegal activity, standing alone, is insufficient to support a conspiracy conviction. <u>United States v. Lyons</u>, 53 F.3d 1198, 1201

8

(11th Cir. 1995) (collecting cases).  However, this is not a mere presence case.  To begin with, an abundance of physical evidence was found throughout the Lake Lowery Road house where Jiminez resided.  See United States v. Garcia, 405 F.3d 1260, 1270 (11th Cir. 2005) (finding that sufficient evidence supported a conviction of knowingly manufacturing marijuana where the defendant's residence contained "117 marijuana plants and a fully-functioning grow house").  Indeed, taking the evidence in the light most favorable to the government as we must, Jiminez lived for several months in a sophisticated marijuana grow house operated by his brother; anyone in or near the house could smell the odor of marijuana; cut marijuana and the implements of a manufacturing and distribution operation such as harvesting tools, a heat sealer, baggies of cut marijuana, and a plate of discarded marijuana parts were located in the living room and kitchen of the house; Jiminez was sleeping either in a bedroom where two ounces of cut marijuana was discovered or in a second bedroom where a duffle bag full of marijuana ready for distribution was found at the time of the search[1]; and, most importantly, Jiminez admitted to a police officer that he had participated in the

---

[1] When police first found Jiminez inside the Lake Lowery Road house, he said that he had been sleeping in the northeast bedroom of the house, where two ounces of marijuana were found. When Jiminez testified at trial, he said that he had been residing in one bedroom of the house but had moved to the other, Jisklif's bedroom, to sleep because he and his brother had guests. That room contained a duffle bag filled with marijuana packaged for distribution.

marijuana grow operation.

Moreover, Jiminez's convictions are supported by his own testimony at trial. Although he denied confessing to participating in the marijuana grow operation, the jury was permitted to reject that testimony, as we must assume it did, and consider that testimony "as substantive evidence of the defendant's guilt." United States v. Brown, 53 F.3d 312, 314 (11th Cir. 1995); see also United States v. Hasner, 340 F.3d 1261, 1272 (11th Cir. 2003) (explaining that "the jury was free to reject" the defendant's testimony and, based upon the evidence and that testimony, "infer that the opposite of [the defendant's] testimony was true"); United States v. Mejia, 82 F.3d 1032, 1038 (11th Cir. 1996) ("A proper inference the jury can make from disbelieved testimony is that the opposite of the testimony is true.").

Finally, the presence of the large quantities of marijuana plants and packaged marijuana ready for distribution at the Lake Lowery Road house, along with the other evidence is more than sufficient to support Jiminez's convictions for possessing with intent to manufacture at least 100 marijuana plants and possessing with the intent to distribute at least 50 kilograms of marijuana. See United States v. Miranda, 425 F.3d 953, 961-62 (11th Cir. 2005) ("Moreover, due to the presence of large quantities of cocaine and methamphetamine, the evidence

10

presented that demonstrated the existence of a conspiracy, and Mr. Miranda's participation in it, was also sufficient to support his convictions for possessing cocaine and methamphetamine."); United States v. Lynch, 934 F.2d 1226, 1231 (11th Cir. 1991) ("Because the presence of cocaine was uncontested, the evidence establishing [the defendant's] participation in the conspiracy also sufficed to prove his possession of the cocaine with intent to distribute.").

## III.

Second, Jiminez claims that the convictions should be overturned, because the district court improperly allowed Detective Wharton to testify about Jisklif's statement to Wharton that the defendant Jiminez was a participant in the marijuana grow operation, in violation of the Sixth Amendment Confrontation Clause.

Notably, at trial, Jiminez did not object to the testimony based on the Confrontation Clause, instead relying only on hearsay grounds; nor did Jiminez ask the district court to give a limiting instruction of any kind. Thus, we review the Sixth Amendment claim only for plain error. United States v. Chau, 426 F.3d 1318, 1321-22 (11th Cir. 2005) ("Because a hearsay objection does not preserve the Crawford issue, our review is only for plain error."); United States v. Baker, 432 F.3d 1189, 1206 n.12 (11th Cir. 2005) ("[D]efense counsels' hearsay objections are insufficient to preserve an objection on Confrontation Clause

11

grounds."). Accordingly, the defendant has the burden of establishing "(1) there is an error; (2) that is plain or obvious; (3) affecting [Jiminez's] substantial rights in that it was prejudicial and not harmless; and (4) that seriously affects the fairness, integrity, or public reputation of the judicial proceedings." United States v. Raad, 406 F.3d 1322, 1323 (11th Cir. 2005). The defendant has failed to establish that the admission of the detective's testimony on redirect examination was error, let alone that it was plain or obvious.[2]

Under the Sixth Amendment, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. As the Supreme Court explained in Crawford v. Washington, the Confrontation Clause of the Sixth Amendment prohibits the admission of out of court statements that are testimonial[3] unless the declarant is unavailable and the defendant had a previous opportunity to cross-examine the declarant. 541 U.S. 36, 51-52 (2004). There can be no doubt that the Confrontation Clause prohibits only statements that constitute impermissible hearsay. The Supreme Court explained

---

[2] "Error is plain when, at the time of appellate review, it is obvious or clear under current law, even if the law at the time of the trial was settled to the contrary." Baker, 432 F.3d at 1207 (quotation marks and citation omitted).

[3] "Statements taken by police officers in the course of interrogations" are "testimonial," including witness statements given to investigating police officers. Crawford, 541 U.S. at 52, 53 n.4.

that "[t]he Clause . . . does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." Crawford, 541 U.S. at 59 n.9; see also Tennessee v. Street, 471 U.S. 409, 414 (1985) ("The nonhearsay aspect of [the delcarant's] confession -- not to prove what happened at the murder scene but to prove what happened when respondent confessed -- raises no Confrontation Clause concerns."). We explained in Baker that if a hearsay statement is testimonial -- "typically [a] solemn declaration or affirmation made for the purpose of establishing or proving some fact" -- its admissibility is prohibited by the Confrontation Clause. 432 F.3d at 1203-04 (quoting Crawford, 541 U.S. at 51). Hearsay, of course, "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted," Fed. R. Evid. 801(c). But, if a trial court admits a statement, made by an available declarant whom the defendant has not had the opportunity to cross-examine, for a purpose other than for the truth of the matter asserted, the admissibility of that statement does not violate the Confrontation Clause. We think that's what happened here.

Detective Wharton's testimony about what Jisklif told him was not admitted in violation of the Confrontation Clause. It was not hearsay; it was not admitted to prove the truth of the matter asserted. See Fed. R. Evid. 801(c). Rather, it was

13

received, we believe, for the limited purpose of showing only that the statement was uttered by Jisklif to Wharton. As we have already explained, during the cross-examination of Wharton, defense counsel questioned the detective at length about the details of the successive interviews with the defendant and Wharton's decision not to obtain a written and signed confession from Jiminez. The cross-examination was designed to impeach Wharton's credibility and suggest that Wharton was lying about the circumstances surrounding the interviews and about Jiminez's confession.

In order to rehabilitate the credibility of Detective Wharton, the prosecution sought to explain to the jury why Wharton would have been motivated to re-interview Jiminez and why Jiminez would tell Wharton on a successive occasion that he had participated in the marijuana grow operation. The prosecutor did just that; on redirect examination, he asked Wharton about his interview with Jisklif for the purpose of explaining why Wharton, after speaking with the defendant's brother, interviewed the defendant once again. Wharton testified that he had spoken to Jisklif and that Jisklif had told him that Jisklif's "brother, Jesus, was living with him and that he was helping him with the marijuana plants." Finally, the detective said "[t]hat's why we went back and interviewed [the defendant] a second time, because, after the first time, we took him at his word, until his brother

14

indicated otherwise, and then we went back and asked him again."

Detective Wharton's statement was admitted only to show what was said, not that it was true. The information derived from Jisklif explained why the detective had re-interviewed Jiminez and why Jiminez may have changed his story to match the one given by his brother. This became relevant precisely because the cross-examination of Wharton had suggested that there was something improper about the repeated interviews of the defendant. The truth of the statement is irrelevant. It is the existence of the statement, not its veracity, that provides the explanation, and thus there is no reason to think about its admissibility in Confrontation Clause terms. Quite simply, there is no reason to test the truth of Jisklif's statement through confrontation. Instead, the only confrontation needed is between the defendant and Detective Wharton -- a confrontation that undisputably occurred and precipitated the challenged redirect examination.

Indeed, the law in this Circuit has long recognized that "[s]tatements by out of court witnesses to law enforcement officials may be admitted as non-hearsay if they are relevant to explain the course of the officials' subsequent investigative actions, and the probative value of the evidence's non-hearsay purpose is not substantially outweighed by the danger of unfair prejudice caused by the impermissible hearsay use of the statement." Baker, 432 F.3d at 1208 n.17; see

15

also <u>United States v. Hawkins</u>, 905 F.2d 1489, 1495-96 (11th Cir. 1990) (explaining that a statement by an out of court witness to a government agent "was properly admissible to explain why the investigation was launched, and to rebut the defense's claims" that there was no basis for the investigation); <u>United States v. Valencia</u>, 957 F.2d 1189, 1198 (5th Cir. 1992) (finding that a statement by an out of court witness to a Drug Enforcement Agency officer was not hearsay, because the comment was not offered for the truth of the matter asserted but, instead, to explain why that officer decided to arrest the defendants after a period of delay); <u>United States v. Love</u>, 767 F.2d 1052, 1063 (4th Cir. 1985) (finding a hearsay statement was admissible, although not for the truth of its assertions, to explain "why a government investigation was undertaken").

We think it fell well within the ample discretion of the trial judge to weigh the danger of unfair prejudice against the probative value of the statement's non-hearsay purpose. Undeniably, the evidence was probative because it rebutted the suggestion that Detective Wharton, an important witness, was lying about his interview with the defendant. Moreover, any purported prejudice resulting from the admission of the statement is minimal; the evidence against Jiminez was ample, including an abundance of physical evidence contained in the home where Jiminez lived and Jiminez's unambiguous confession that he had participated in

16

the marijuana grow operation.

Although the trial transcript contains no explicit statement by the district court explaining why it overruled Jiminez's hearsay objection[4], we assume that the district court admitted the statement for the limited purpose of rehabilitating Detective Wharton's credibility.  See generally Garcia v. Aetna Cas. & Sur. Co., 657 F.2d 652, 654 (5th Cir. 1981) (after noting that the purpose for which the evidence was admitted was unclear, the court looked to the reasons supplied on appeal by the proponent of the admitted evidence); Null v. Wainwright, 508 F.2d 340, 344 (5th Cir. 1970) (explaining that "appellate courts assume that trial judges rely upon properly admitted and relevant evidence").

The law in our Circuit is clear that even when the trial judge admits testimony for a stated reason that is improper under the Federal Rules of Evidence, the decision generally will be upheld so long as the testimony is properly admissible on other, non-stated grounds apparent from the record.  Goldsmith v. Bagby Elevator Co., 513 F.3d 1261, 1286 (11th Cir. 2008); see also Orser v. United States, 362 F.2d 580, 586 (5th Cir. 1966) (finding the defendant was not prejudiced by the admission of "testimony for the wrong reason . . . , because the

---

[4]  Specifically, after Detective Wharton said that he had spoken with Jisklif and Jisklif had given him an indication of Jiminez's role in the marijuana grow operation, the prosecutor asked Detective Wharton "What did [Jiminez] say?"  Defense counsel immediately stated "Hearsay.  Objection.  Hearsay" and the district court simply responded "Overruled."

testimony was clearly admissible for a different reason"). This is so because "[w]e can uphold the decision of the district court on any grounds that appear in the record." Goldsmith, 513 F.3d at 1286; see also Powers v. United States, 996 F.2d 1121, 1123-24 (11th Cir. 1993) (affirming district court "but for reasons other than those used by the district court"). In short, the district court did not err, let alone plainly err, in admitting Detective Wharton's statement. Its admission did not violate the Sixth Amendment's Confrontation Clause.

But, even if we were to assume that it was error to admit this evidence and the error was plain, it did not affect the defendant's substantial rights, nor did it seriously affect the fairness, integrity, or reputation of the judicial proceeding. This is not a close case where Jisklif's statement that Jiminez participated in the crime tipped the balance of evidence in favor of conviction. Instead, as we have noted, this is a case where the defendant was found living in a house that contained massive evidence of a large-scale, sophisticated marijuana grow operation in every room, including the defendant's bedroom, and where the defendant confessed to participating in the marijuana grow operation.

IV.

Finally, we reject Jiminez's suggestion that the district court abused its discretion in admitting evidence of the marijuana grow house located at 1701

Champagne Road because the evidence was purportedly irrelevant and prejudicial. See Transamerica Leasing, Inc. v. Inst. of London Underwriters, 430 F.3d 1326, 1331 (11th Cir. 2005) (explaining that a district court's evidentiary rulings are reviewed for abuse of discretion). The evidence regarding the Champagne Road house was relevant to the conspiracy. Police officers had observed multiple vehicles traveling back and forth between the Lake Lowery Road and Champagne Road houses. And, just prior to searching the grow house, they observed a black truck loaded with marijuana flee the Lake Lowery Road house and travel in the direction of the Champagne Road house. Moreover, the sophisticated marijuana grow operations in both houses were strikingly similar. This is sufficient to establish that the Champagne Road house was involved with the grow operations at the Lake Lowery Road house, and thus permit the admissibility of the evidence.

Accordingly, we affirm.

**AFFIRMED.**

QUIST, District Judge, Concurring:

I respectfully suggest that the better practice in this case would have been for the district court to have given an instruction as to the limited purpose of Detective Wharton's testimony regarding Jisklif's statement about Jiminez's involvement in the grow operation, *i.e.*, Jisklif's statement could only be considered to show what was said and its effect upon Jiminez, and not that Jisklif's statement was true. Even though learned judges on appeal might figure out a rationale for the admissibility of evidence introduced for a limited purpose, there is no assurance, and much doubt, that a typical jury, on its own, would recognize the limited nature of the evidence. In any event, I believe that any error in this case would be harmless and not amount to plain error. *See*, *United States v. Arbolaez*, 450 F.3d 1283, 1289-92 (11th Cir. 2006).