[DO NOT PUBLISH]


IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 19-11945
Non-Argument Calendar
_____

D.C. Docket No. 2:18-cr-00127-SPC-UAM-1


UNITED STATES OF AMERICA,

Plaintiff–Appellee,

versus

TOMMY N. TRACY,

Defendant–Appellant.
_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(March 26, 2020)

Before MARTIN, ROSENBAUM, and ANDERSON, Circuit Judges.

PER CURIAM:

Tommy Tracy was convicted of committing fraud in connection with major-

disaster benefits, in violation of 18 U.S.C. §§ 1042(a)(2), (b)(3).  On appeal, he

argues that the district court erred in denying his motion for judgment of acquittal because insufficient evidence was presented at trial for the jury to find beyond a reasonable doubt that he knowingly submitted a fraudulent application to obtain major-disaster benefits from the Federal Emergency Management Agency. After careful review of the record, we affirm Tracy's conviction.

## I. BACKGROUND

We begin by reviewing the events leading to Tracy's indictment for and conviction of major-disaster benefits fraud, noting that we "view[] the evidence in the light most favorable to the government, and draw[] all reasonable factual inferences in favor of the jury's verdict." *United States v. Jiminez*, 564 F.3d 1280, 1284 (11th Cir. 2009).

Based on the evidence adduced at trial, Tracy owned a two-story house in North Fort Myers, Florida, which was subdivided into three apartments: two on the first floor and one on the second. At the time that Hurricane Irma struck the area in mid-September 2017, all three apartments were occupied by tenants. On the first floor, Marion Plau and her boyfriend rented one of the first-floor apartments since 2013, Charles Hatchett rented the other first-floor apartment since 2011 or 2012, and John Hunter and Ashley Hoffrichter rented the second-floor apartment since 2015 or 2016. Sometime before the hurricane, Tracy began living on the property—but in a travel trailer, not in any of the apartments.

Shortly after the hurricane hit, Tracy submitted an online application for individual assistance. The application identified Tracy as the applicant and owner of the North Fort Myers property and listed Hunter as a "boarder." The property was marked as Tracy's primary residence—that is, the location where he lived for six months or more out of the year. The type of residence was listed as "house-single/duplex," but the available choices included "travel trailer." The application indicated that the home listed as the primary residence, as well as its contents, had been damaged by the disaster. The application also indicated that Tracy did not own a rental property that had been damaged by the disaster. Relevantly, FEMA grant programs like the one for which Tracy applied were available *only* to applicants whose primary residence had been damaged.

After Tracy submitted his application for FEMA assistance, the agency sent him a letter confirming his application for disaster assistance, providing information about available assistance, and listing the criteria for eligibility. Relevantly, one of the criteria was that the home damaged by the disaster must be the applicant's "primary residence, where you live the majority of the year." The application clarified that FEMA would conduct an investigation of his home.

FEMA inspector Matthew McCash met with Tracy on October 8, 2017, to inspect his property. Tracy had already submitted proof of ownership of the house to FEMA, which verified that he owned it. Tracy told McCash that the first floor

3

was his primary residence, but apparently did not state that he had been living in the first floor at the time of the hurricane.  McCash testified that if Tracy had informed him that the first floor was *not* his primary residence, he would have concluded that Tracy was ineligible for FEMA assistance and would not have conducted the investigation.  McCash inspected the first floor, but not the second—he saw that there were tenants living in it and assumed that Tracy had rented it out.  As part of his inspection, McCash gave Tracy a disclosure statement, which stated that misinforming FEMA could lead to federal prosecution.  Tracy read and signed the disclosure.

After receiving the results of McCash's investigation, FEMA issued an award letter to Tracy, stating that he was eligible for a total of $24,211.50 of assistance—$17,199.50 for home repairs, $5,100 for personal property, and $1,912 for temporary housing.  Tracy received an electronic funds transfer from FEMA to his personal bank account for $24,211.50, and stayed in a FEMA-paid hotel for approximately six months.

Each of Tracy's tenants suffered damage as a result of the hurricane, but received little to no assistance from Tracy.  Hatchett specifically testified that Tracy asked him not to file for FEMA benefits, and told Hatchett stated that he would help him by either letting him move back in once the apartments were repaired or by paying him for his lost belongings.  Tracy later gave Hatchett a

4

check for $1,000, which stated that it was for "help[ing] around the property," but which Hatchett believed was intended to help him out "because of what [he] had been through and lost."

Similarly, Plau testified that she had to relocate after the hurricane—the first floor of the house had flooded, damaging the building and her belongings. Tracy advised her to apply for FEMA assistance, but when she did so, FEMA stated that her benefits had already been claimed and did not award her any damages. She testified that she later learned that Tracy had received FEMA assistance, but did not give any to her.

Hoffrichter testified that her apartment had suffered some damage from the rain and was without electricity for three weeks. She said that Tracy advised her and the other tenants *not* to apply for FEMA benefits, telling them that he would take care of them. She submitted a FEMA application anyway, which was denied because Tracy had already claimed the benefits. Hoffrichter reported Tracy after discovering that he received money from FEMA. She also testified that she and Hunter did not speak to McCash when he inspected the property because Tracy had told them to "just stand back" and, if asked, to tell McCash that they were guests. Hunter testified to a similar effect—that their apartment had suffered a "[l]ittle bit of water" damage, he applied for FEMA benefits in his own name, but did not receive any.

5

On January 12, 2018, Daniel Lopez, a special agent with the Department of Homeland Security's Office of the Inspector General, traveled to the North Fort Myers property as part of his investigation into Tracy for FEMA fraud. Lopez spoke with Hunter and Hoffrichter, but their conversation was interrupted by Tracy's arrival. Tracy told Lopez that he resided part of the year in a travel trailer and the other part in the Florida Keys, and that the North Fort Myers house was not his primary residence.

On August 15, 2018, Tracy was indicted on one count of committing major-disaster benefits fraud. The case proceeded to trial, and the government presented the aforementioned evidence. At the close of the government's case in chief, Tracy moved for a judgment of acquittal, arguing that (1) the evidence showed that the North Fort Myers property was his primary residence at the time of Hurricane Irma, and (2) that Tracy's listing of Hunter as a "boarder" on the application indicated that his answer that he did not own a rental property that had been damaged by the hurricane was merely an error. The district court denied Tracy's motion.

Tracy then presented his own case. He called Dr. Hyman Eisenstein, a psychologist and expert in neuropsychology. Dr. Eisenstein testified that he had performed a neuropsychiatric evaluation of Tracy. He confirmed that although Tracy's intelligence quotient fell within "the average range of intellectual

6

functioning," other tests revealed "severe impairment in the frontal lobes." These impairments affected Tracy's judgment and reasoning, causing him "mental confusion, difficulty with making decisions, [and] not profiting from feedback." While he could "maintain in most areas cognitive function . . . within the normal limits," his ability to make decisions "at a higher level of cognitive functioning" was impaired. In the context of filling out an application, this impairment would cause him to be more likely to make mistakes. Following Dr. Eisenstein's testimony, Tracy rested and did not testify in his defense. He renewed his motion for a judgment of acquittal, which the district court again denied.

The jury found Tracy guilty. The district court adjudged him guilty and conducted a sentencing hearing. At the hearing, the court noted that Tracy was 72 years old and had no criminal history. Accordingly, Tracy was sentenced to time served and a 5-year term of supervised release, and was ordered to pay $41,392.66 in restitution. Tracy timely appealed to us.

## II. ANALYSIS

As an initial matter, we review a challenge to the sufficiency of the evidence *de novo* to determine "whether a reasonable jury could have found the defendant guilty beyond a reasonable doubt." *United States v. Mercer*, 541 F.3d 1070, 1074 (11th Cir. 2008). In making that determination, we "view[] the evidence in the light most favorable to the government, and draw[] all reasonable factual

inferences in favor of the jury's verdict." *United States v. Jiminez*, 564 F.3d 1280, 1284 (11th Cir. 2009).  This analysis "is identical regardless of whether the evidence is direct or circumstantial, and no distinction is to be made between the weight given to either." *United States v. Mieres-Borges*, 919 F.2d 652, 656-67 (11th Cir. 1990) (quotation mark omitted).  However, "[w]hen the government relies on circumstantial evidence, reasonable inferences, not mere speculation, must support the conviction." *United States v. Mendez*, 528 F.3d 811, 814 (11th Cir. 2008).  In reviewing the sufficiency of the evidence, we "assume that the jury made all credibility choices in support of the verdict." *United States v. Maxwell*, 579 F.3d 1282, 1299 (11th Cir. 2009).  Moreover, "the evidence need not exclude every reasonable hypothesis of innocence." *United States v. Knowles*, 66 F.3d 1146, 1154 (11th Cir. 1995) (quotation marks omitted).

Under 18 U.S.C. § 1040, it is illegal to

> knowingly . . . make[] any materially false, fictitious, or fraudulent statement or representation, or make[] or use[] any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or representation, in any matter involving any benefit authorized, transported, transmitted, transferred, disbursed, or paid in connection with a major disaster declaration . . . .

18 U.S.C. § 1040(a).

"The term 'knowingly' means that the act was performed voluntarily and intentionally, and not because of a mistake or accident." *United States v. Woodruff*, 296 F.3d 1041, 1047 (11th Cir. 2002) (addressing a conviction under 18

8

U.S.C. § 1951(a)).  Absent a statutory directive, "the term 'knowingly' merely requires proof of knowledge of the facts that constitute the offense."  *Bryan v. United States*, 524 U.S. 184, 193 (1998).

On appeal, Tracy's core argument is that there was insufficient evidence to show that his application was "knowingly and fraudulently" made.  He argues that the government only presented circumstantial evidence of his intent to commit major-disaster benefits fraud, and that the evidence adduced at trial actually shows that the North Fort Myers house *was* his primary residence at the time of the hurricane.  Tracy further argues that, because of his mental deficits, the application was confusing to him and that it is unreasonable to conclude that his conduct was criminally culpable.

Based on the evidence presented at trial, we conclude that the district court did not err in denying Tracy's motion for a judgment of acquittal and that his arguments are without merit.  The evidence shows that Tracy was provided with adequate—but easy-to-follow—information from FEMA explaining that assistance was available only to damage to primary residences, which FEMA documents explained in plain terms.  Even if we assume that he experienced difficulty in filling out the application because of his mental deficits, those deficits do not explain why he would then *repeat* that misinformation to McCash when he conducted an in-person inspection.  McCash's testimony—that Tracy told him that

his primary residence was the first floor of the North Fort Myers property—was not contradicted.

Moreover, the testimony of Tracy's tenants supports the jury's guilty verdict. Hatchett and Hoffrichter specifically testified that Tracy had advised the tenants *not* to apply for benefits, because he would take care of them. But despite the fact that Tracy received a nearly $25,000 payout from FEMA, he provided only Hatchett with anything—and even then, just a $1,000 check, which he claimed was for Hatchett's assistance around the property, *not* as compensation for damage to his property or possessions.

The cumulative effect of this testimony—which, again, was uncontradicted by Tracy—was that Tracy knowingly misrepresented the North Fort Myers property as his primary residence, repeated that misrepresentation to McCash, and lied to his tenants in an attempt to dissuade them from filing for benefits themselves. The inferences necessarily drawn by the jury to that effect—which involved crediting the government's witnesses over Tracy's expert witness—were entirely reasonable. We read Tracy's arguments to the contrary as essentially asking us to make another inference based on the evidence—one that is more favorable to him. But doing so would obviate our duty to draw all reasonable inferences in favor of the jury's verdict. *Jiminez*, 564 F.3d at 1284.

### III. CONCLUSION

We conclude that the district court did not err in denying Tracy's motion for judgment of acquittal because the government presented sufficient evidence for the jury to find that he knowingly provided false answers on his application for FEMA relief, and it was within the province of the jury to credit the testimony of the government's witnesses over that of Tracy's expert.  Accordingly, Tracy's conviction is

**AFFIRMED.**