[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 24-10329

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

JALAL HAJAVI,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:19-cr-00443-TWT-JEM-1

_____

Before ROSENBAUM, NEWSOM, and GRANT, Circuit Judges.

PER CURIAM:

Jalal Hajavi appeals his convictions for willfully violating the trade embargo on Iran, as currently embodied in the International Emergency Economic Powers Act ("IEEPA"), codified at 50 U.S.C. §§ 1701–07, and regulations promulgated in accordance with that Act. Hajavi argues that the district court erred in failing to properly instruct the jury about the *mens rea* required for IEEPA violations, and that insufficient evidence shows he knew that his conduct— sending heavy construction equipment overseas to be reexported to Iran without a license—was unlawful. After careful review, and in light of our decision in *United States v. Singer*, 963 F.3d 1144 (11th Cir. 2020), we see no reversible error in the court's jury instructions, and we conclude that sufficient evidence establishes that Hajavi knew his conduct was prohibited by federal law and regulations. Accordingly, we affirm.

## I.

A grand jury in the Northern District of Georgia returned an indictment charging Hajavi with one count of conspiracy to violate the IEEPA and its regulations, *see* 50 U.S.C. § 1705, two counts of violating the IEEPA and its regulations, *id.*, and one count of smuggling goods from the United States, *see* 18 U.S.C. § 554. Because Hajavi's convictions all depend on the IEEPA and its implementing regulations, we begin with a review of the governing legal

background before turning to the facts of Hajavi's case and the district court's instructions to the jury.

*A.*

The IEEPA authorizes the President of the United States to declare a national emergency and impose economic sanctions "to deal with any unusual and extraordinary threat."   50 U.S.C. § 1701(a).  The President also may issue implementing regulations. *Id.* § 1704.

In 1995, the President issued an executive order declaring that the Government of Iran constituted an unusual and extraordinary threat under the IEEPA.  *See* Exec. Order No. 12957, 60 Fed. Reg. 14615 (Mar. 15, 1995).  Subsequent executive orders prohibited the exportation, reexportation, sale, or supply of goods, technology, and services from the United States to Iran, and authorized the Secretary of the Treasury to issue implementing regulations.  Exec. Order No. 12959, 60 Fed. Reg. 24757 (May 6, 1995); Exec. Order No. 13059, 62 Fed. Reg. 44531 (Aug. 19, 1997).  These regulations are now known as the Iranian Transactions and Sanctions Regulations ("ITSR").  *See* 31 C.F.R. Part 560.  The national emergency with respect to Iran remains in effect.  *See Continuation of the National Emergency with Respect to Iran*, 83 Fed. Reg. 11393 (Mar. 12, 2018).

The ITSR generally prohibits all U.S. goods or services from going to Iran, directly or indirectly, unless authorized by a license issued by the Treasury Department's Office of Foreign Assets Control ("OFAC").    Section   204   forbids   "the   exportation,

reexportation, sale, or supply, directly or indirectly, from the United States, . . . of any goods, technology, or services to Iran or the Government of Iran." 31 C.F.R. § 560.204. That prohibition includes

> the exportation, reexportation, sale, or supply of any goods, technology, or services to a person in a third country undertaken with knowledge or reason to know that . . . [s]uch goods, technology, or services are intended specifically for supply, transshipment, or reexportation, directly or indirectly, to Iran or the Government of Iran.

*Id.* § 560.204(a). Section 205 prohibits "the reexportation from a third country" to Iran of goods exported from the United States. *Id.* § 560.205(a). Section 206 outlaws "transactions and dealings" related to the export, reexport, sale, or supply of goods, directly and indirectly, to Iran. *Id.* § 560.206(a). And § 203 prohibits transactions that evade, avoid, violate, or attempt to violate the ITSR's prohibitions, as well as conspiracies formed to violate such prohibitions. *Id.* § 560.203.

The IEEPA makes it "unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under [the IEEPA]." 50 U.S.C. § 1705(a). And it creates criminal liability for persons who "willfully" commit, attempt to commit, or conspire to commit a violation of any regulation issued under the IEEPA. 50 U.S.C. § 1705(c).

*B.*

Hajavi was an Iranian citizen and lawful permanent U.S. resident who owned and operated a Florida company called JSH Heavy Equipment, LLC.  JSH's business involved trading in heavy construction equipment, including exporting such equipment from the United States to the Middle East.

In August 2014, federal investigators flagged a pending shipment from JSH to a company located in the United Arab Emirates ("UAE") that had been deemed an unreliable recipient of U.S.-origin goods.  The UAE is viewed by the U.S. government as a "transshipment diversion point[]" for embargoed goods, meaning a place where goods are sent from the United States to be rerouted to blocked destinations, such as Iran.

Tina Korb, an agent with the Department of Commerce's Bureau of Industry and Security ("BIS"), identified Hajavi as the owner of JSH and spoke with him in person for approximately 45 minutes on August 26, 2014.  During this outreach visit, they discussed Hajavi's operations and various export regulations, including "embargoed countries" where Agent Korb said Hajavi "could not ship to" without a license issued by OFAC.  As Agent Korb listed the covered countries, including Iran, Hajavi interjected that he was "well aware that he cannot ship to Iran because he was from Iran."

Agent Korb also reviewed Hajavi's responsibilities as an exporter regarding transshipment, or reexporting, of goods to Iran.  She explained that it was illegal to ship U.S. items to the UAE that

are then reexported to Iran, and that Hajavi, as the exporter of record, "can't self-blind" and "needed to make sure who he was conducting business with."  She told Hajavi that "transshipment of items knowingly would be a problem, and that if that were to occur, there could be ramifications for that."  Agent Korb asked for additional information from Hajavi about the trading company and transaction to release the detention on his shipment.  Before concluding the meeting, Agent Korb referred Hajavi to BIS's website, which contained all of the information she had raised with him.

In the following weeks, Agent Korb emailed Hajavi to ask him for any correspondence with the trading company, and also to send various documents and information, including "best practices for preventing transshipment diversion, which discusses . . . making sure that your goods are not diverted into prohibited countries like Iran."  Hajavi never provided the requested information.

Although Hajavi told Agent Korb he mostly shipped to Jordan and Saudi Arabia, that's not what U.S. export records showed. In fact, from 2009 through 2017, export records from the Automated Export System[1] reflect 254 total shipments made by Hajavi

---

[1] The Automated Export System captures certain information reported to the U.S. government about shipments from the United States, including the name and address of the person or company exporting the goods, the "intermediate consignee," if any, the "ultimate consignee" or intended user, and information about any required licenses, among other information.

and JSH, all but six of which went to the UAE.  The remaining shipments went to Turkey, not Jordan or Saudi Arabia.

By May 2016, the government had received information that items of heavy equipment exported by JSH had been reexported to Iran from the UAE.  BIS Agent John Conley began looking into Hajavi and JSH's export records, which reflected shipments to UAE-based general trading companies, many of which were located in "free trade zones."  Free trade zones in the UAE allow businesses to avoid certain taxes and fees on items imported for the purpose of reexport.  Conley testified that, in his training and experience, many general trading companies in free trade zones were "used as a means to obtain U.S. commodities by people in Iran."

Through his investigation, Agent Conley identified a person in Iran named Reza Maghsoudi who was acquiring JSH equipment through the general trading companies.  Maghsoudi was employed as the managing director of an Iranian import/export company called Aypa, which was based in Tehran, Iran.  Hajavi has known Maghsoudi since at least 2010, and knew that Maghsoudi was located in Iran and worked for an Iranian company.

Agent Conley obtained search warrants for certain email accounts associated with Hajavi and Maghsoudi, and also executed a search warrant at Hajavi's residence and home office.  During the search of Hajavi's residence, officers found an administrative subpoena sent to Hajavi in July 2009, related to the attempted shipment of Caterpillar tractor parts to Iran in 2007.  The subpoena advised that export "regulations prohibit most commercial

8                    Opinion of the Court                    24-10329

transactions with the government of Iran and persons in Iran by U.S. persons unless authorized under OFAC license or otherwise exempt by statute," and that there was no record of a license for the shipment.

Agent Conley testified that his investigation showed that, in general, Hajavi located and procured heavy equipment in the United States for Maghsoudi and arranged for its export to trading companies in the UAE. To make the transaction look like two separate sales, Hajavi would purportedly sell the equipment to the trading company, which would, in turn, purportedly sell it to Maghsoudi, who would arrange to have the equipment reexported to Iran once it arrived in the UAE. Maghsoudi would cause payment to issue to Hajavi through the UAE.

Agent Conley testified in particular about the shipment of an Ingersoll Rand DM45E rotary drill in late 2015 and early 2016. Hajavi purchased the drill from a company in Kentucky on December 7, 2015, after emailing Maghsoudi pictures of the drill. That same day, Hajavi prepared an invoice reflecting the sale of the drill from JSH to Rassel Dena General Trading, which was located in the free trade zone in Jebel Ali, UAE. The next day, Hajavi contacted a freight company to arrange for shipment to the Jebel Ali port based on the Rassel Dena invoice. A separate invoice dated December 10, 2015, reflects the purported sale of the same drill from Rassel Dena to Maghsoudi at an Iranian address. The drill left the United States in January 2016, and was subsequently shipped to

Bandar Abbas, Iran, on February 24, 2016, with Maghsoudi listed as the recipient of the shipment.

Apart from the invoices, government agents found no other transaction records from Hajavi involving Rassel Dena, such as payment for the purported drill purchase from JSH. Instead, agents recovered an email from Maghsoudi's email account dated January 14, 2016, that contained an attached document titled, "Havaleh," which was a wire transfer receipt for funds transferred to JSH for the "[p]urchase of heavy machinery by Rassel Dena." Agent Conley explained that "Havaleh" was the Farsi word for an unregulated cash exchange system—described as "hawala" in the agent's testimony—where money from Iran can be routed for deposit in the UAE so that it "can then be transmitted to the U.S. without looking as though it has a connection to Iran." A review of JSH's bank records showed that, in December 2015, JSH received two wire-transfer payments from a trading company in the free trade zone (not Rassel Dena) that totaled the cost associated with JSH's invoice and shipping costs plus one percent.

## C.

In his proposed jury instructions, Hajavi requested language requiring the jury to find that he "was specifically aware of the prohibitions in 31 C.F.R. §§ 560.204 and 560.206" on exportation, reexportation, or transshipment of items to Iran. In Hajavi's view, it was "not enough for the government to prove that Mr. Hajavi's shipments to the UAE were with the purpose of circumventing the prohibition on shipping to Iran." Rather, "the government must

prove that he knew shipping to the UAE was unlawful if he had knowledge that the items would be re-exported or transshipped to Iran."

During the charge conference, the government responded that Hajavi's proposed language essentially charged the jury that Hajavi "had to have been aware of the specific regulations that applied to him," which was not an accurate statement of the law. The district court agreed, stating that, under this Court's decision in *United States v. Singer*, 963 F.3d 1144 (11th Cir. 2020), Hajavi did not "need[] to be specifically aware of the regulations," so long as "he knew what he was doing was illegal." Defense counsel conceded that it would not be appropriate to instruct the jury that Hajavi had to know the regulations by number or to have read the text of those specific regulations. While the court said it would not be "specifically referring to the regulations by number," it decided to add the phrase, "specifically, the prohibitions on exportation and re-exportation of items to Iran," in reference to the regulations.

Thus, the district court's instructions generally informed jurors that, to convict Hajavi under the IEEPA, they had to find beyond a reasonable doubt that Hajavi acted "willfully, that is, voluntarily and intentionally in violation of a known legal duty, specifically the prohibitions on exportation and re-exportation of items to Iran." The instructions elaborated that "[a]n act is done willfully if it is committed with the knowledge that it was prohibited by law or regulation and with the purpose of disobeying or disregarding the law or regulation," and that, while it was not necessary to show

that Hajavi "had read, was aware of, or had consulted the specific regulations governing his activities," the government "must prove beyond a reasonable doubt, by reference to facts and circumstances surrounding the case, that the Defendant knew that his conduct was unlawful."

During closing arguments, before the district court's instructions, the prosecutor addressed the "willful" element for IEEPA violations, among other things. The government was "not required to prove that Mr. Hajavi read, was aware of, or had consulted the Iranian transaction and sanctions regulations," the prosecutor said; instead, the government must prove "that he knew his conduct was unlawful, and that he acted with the specific purpose of disobeying and disregarding the laws regarding export and re-export of goods to Iran."

Defense counsel portrayed Hajavi as an innocent trader in heavy equipment who got tripped up by complex export regulations. He argued that the "the Government has to prove that Mr. Hajavi knew that the exportation and re-exportation to Iran was illegal." And he advised the jury that "the Judge will instruct you . . . about the fact that you will consider Mr. Hajavi's intent and what his known legal duty was, and that legal duty included that he had to know he could not re-export to Iran." Defense counsel also argued that the evidence failed to show that Hajavi knew "it was illegal to re-export his equipment to Iran."

In reply, the government asserted that Hajavi "knew of his legal duty specifically not to export or re-export" because he had

been expressly told by Agent Korb in 2014 that it was unlawful to send heavy equipment to the UAE knowing that it will be reexported or transshipped to Iran.

Ultimately, the jury returned a verdict finding Hajavi guilty on all four counts. The district court sentenced him to 24 months of imprisonment, followed by a three-year term of supervised release. Hajavi now appeals.

**II.**

We review a district court's refusal to give a requested jury instruction for an abuse of discretion. *United States v. Richardson*, 532 F.3d 1289, 1289 (11th Cir. 2008). We will find reversible error in the refusal to give a requested jury instruction "only if (1) the requested instruction correctly stated the law; (2) the actual charge to the jury did not substantially cover the proposed instruction; and (3) the failure to give the instruction substantially impaired the defendant's ability to present an effective defense." *Id.* (quoting another source). Instructions "must be evaluated not in isolation but in the context of the entire charge." *United States v. Gonzalez*, 834 F.3d 1206, 1222 (11th Cir. 2016) (quotation marks omitted).

Hajavi challenges whether the district court correctly instructed the jury on the intent element under the IEEPA. Section 1705(c) imposes criminal sanctions on only those persons who "willfully" violate regulations issued under the IEEPA. 50 U.S.C. 1705(c). The requirement of willfulness "connotes a voluntary, intentional violation of a known legal duty." *United States v. Adames*, 878 F.2d 1374, 1377 (11th Cir. 1989). "[W]hen it comes to crimes

involving complex regulatory schemes, we generally do not criminally punish individuals engaged in conduct they reasonably believed to be innocent." *Singer*, 963 F.3d at 1158.

To obtain a conviction under the IEEPA, the government must prove both that the defendant violated § 1705 and the underlying regulation and that he "knew of the facts that made his conduct a violation of these provisions." *Id.*; *see also United States v. Sotis*, 89 F.4th 862, 873 (11th Cir. 2023). As we noted in *Singer,* "the exportation of goods from the United States is not so obviously evil or inherently bad that the willfulness requirement is satisfied, even if [the defendant] did not know of the facts that rendered his conduct illegal." *Singer*, 963 F.3d at 1158 (cleaned up). So "the jury had to find [Hajavi] knew the [conduct] in which he engaged was unlawful." *Ratzlaf v. United States*, 510 U.S. 135, 149 (1994).

Hajavi proposed the following jury instruction, or substantially similar language, as an element for each of the four counts: "The defendant was specifically aware of the prohibitions in 31 C.F.R. §§ 560.204 and 560.206 on exportation, re-exportation, or transshipment of items to Iran." He claims that the district judge had to instruct that his known legal duty included not just "that he wasn't allowed to export to Iran, but that he also wasn't allowed to export from the United States with knowledge that his items would be re-exported by someone else to Iran."

Here, the district court did not abuse its discretion by declining to give Hajavi's requested instruction. For starters, Hajavi's proposed instruction risked confusing the jury. Hajavi concedes

that "a conviction did not necessarily require proof that Mr. Hajavi had read the specific regulations articulated in the ITSR, or 31 U.S.C. Part 560." But his proposed instruction effectively required just that, stating that an element of the offense included whether he was "specifically aware" of the prohibitions in "31 C.F.R. §§ 560.204 and 560.206." The instruction risked leading the jury to believe that the government was required to prove Hajavi's awareness of the specific regulations that prohibited exporting or reexporting goods to Iran without a license.

But as we explained in *Singer*, in proving that a defendant "had the necessary factual knowledge, the government need not *directly* demonstrate that the defendant knew the facts that made his conduct a violation of the law." *Singer*, 963 F.3d at 1158. Rather, the government may prove the defendant's knowledge through circumstantial "evidence that allows the jury to draw that reasonable inference." *Id.* In particular, the government "may present evidence that it engaged in 'affirmative efforts' to warn the defendant of the regulatory requirement he later violated or that the defendant's conduct indicated that he knew of the fact that a regulation or statute prohibited his conduct." *Id.* Thus, Hajavi's proposed instruction, by tying awareness to the specific regulations, risked imposing a direct knowledge requirement at odds with *Singer*.

Moreover, the district court substantially covered the substance of Hajavi's proposed instruction in the charge it gave. The court instructed jurors that, to convict Hajavi under the IEEPA,

they had to find beyond a reasonable doubt that Hajavi acted "willfully, that is, voluntarily and intentionally in violation of a known legal duty, specifically the prohibitions on exportation and re-exportation of items to Iran." The instructions elaborated that, while it was not necessary to show that Hajavi "had read, was aware of, or had consulted the specific regulations governing his activities," the government "must prove beyond a reasonable doubt, by reference to facts and circumstances surrounding the case, that the Defendant knew that his conduct was unlawful." Thus, the court's instructions accurately and clearly conveyed that, to convict Hajavi, the jury needed to find beyond a reasonable doubt that Hajavi knew that conduct was prohibited by a statute or regulation.

Hajavi asserts that the instructions were too "vague" and failed to define in more detail his "known legal duty." We generally leave questions of style and wording to the district court, though, so long as the charge as a whole sufficiently instructed the jury about the issues. *See Singer*, 963 F.3d at 1162–63. And we are not persuaded that the instructions in this case were too vague to guide the jury's deliberations.

With regard to Count Three, for example, the jury was required to find that Hajavi "knew or had to know that the good was intended for delivery to Iran or to a person in a third country for supply, transshipment, or re-exportation, directly or indirectly, or Iran," that Hajavi failed to obtain a license, and that he "did so willfully, that is, voluntarily and intentionally in violation of a known

legal duty, specifically the prohibitions on exportation and re-exportation of items to Iran."[2]  The instructions also advised that "it was unlawful to export goods from the United States to Iran, either directly or indirectly, including re-exporting a United States-origin item from one foreign country to another foreign country" without a license.  These instructions adequately conveyed the idea that Hajavi could be convicted only if he knew that engaging in reexportation to Iran through a third country was unlawful.

The refusal to give Hajavi's proposed instructions also did not impair Hajavi's ability to present his defense, let alone substantially impair it.  Even under the court's instructions, Hajavi was just as able to argue to the jury that the government failed to prove he knew of the fact that federal law and regulations prohibited him from sending items to the UAE for reexportation to Iran. *See Singer*, 963 F.3d at 1163.  As we have noted, Hajavi's counsel argued to the jury that the government had to prove that Hajavi "knew that the exportation and re-exportation to Iran was illegal," that Hajavi's "known legal duty . . . included that he had to know he could not

---

[2] With respect to Count Four, Hajavi complains that the district court's general reference to "the prohibitions on exportation and re-exportation of items to Iran" fails to capture the specific practices prohibited by 31 C.F.R. § 560.206. But that argument was not raised before the district court, so our review is for plain error only.  In any case, the court's instructions for Count Four included specific language tailored to the prohibitions contained in § 206, requiring proof that Hajavi "knew that the law required a license or authorization to engage in a transaction or dealing in or related to the exportation, re-exportation, sale, or supply, directly or indirectly, to Iran," and that he "acted with the intent to disobey or disregard the law."

re-export to Iran," and that insufficient evidence showed Hajavi knew "it was illegal to re-export his equipment to Iran." Counsel otherwise argued that the regulations were complex and hard to understand. In reply, the government did not dispute the legal points, arguing instead that Agent Korb's testimony established Hajavi's knowledge that it was unlawful to export items to the UAE knowing they will be reexported or transshipped to Iran.

In sum, Hajavi has not shown that the district court abused its discretion or committed reversible error when it declined to give his proposed jury instruction. *See Singer*, 963 F.3d at 1162–63; *Richardson*, 532 F.3d at 1289.

## III.

In reviewing the sufficiency of the evidence, we view the record in the light most favorable to the government, resolving all reasonable inferences in favor of the verdict. *United States v. Jiminez*, 564 F.3d 1280, 1284 (11th Cir. 2009). The evidence is sufficient to support a conviction if "a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt." *Id.* at 1284–85 (quotation marks omitted).

The test for sufficiency is the same, regardless of whether the evidence is direct or circumstantial, but when the government relied on circumstantial evidence, reasonable inferences must support the conviction. *United States v. Martin*, 803 F.3d 581, 587 (11th Cir. 2015). We assume that the jury resolved all questions of credibility in a manner supporting the verdict. *Jiminez*, 564 F.3d at 1285. The evidence need not exclude every reasonable hypothesis of

innocence for a reasonable jury to find guilt beyond a reasonable doubt. *United States v. Cruz Valdez*, 773 F.2d 1541, 1545 (11th Cir. 1985) (*en banc*). Instead, the jury is free to choose among alternative, reasonable interpretations of the evidence. *Id.* "A jury's verdict cannot be overturned if any reasonable construction of the evidence would have allowed the jury to find the defendant guilty beyond a reasonable doubt." *United States v. Watts*, 896 F.3d 1245, 1251 (11th Cir. 2018) (quotation marks omitted).

Here, the government presented sufficient evidence to establish the necessary intent. We reject Hajavi's argument that the government failed to prove beyond a reasonable doubt that he "knew that it was illegal to have his equipment re-exported to Iran from another country by a third-party." The government's circumstantial evidence, construed in the light most favorable to the verdict, established that Hajavi knew it was unlawful to ship items to the UAE for reexportation to Iran without a license.

As outlined in *Singer*, the government put on evidence "that it engaged in affirmative efforts to warn [Hajavi] of the regulatory requirement[s] he later violated." *Singer*, 963 F.3d at 1158. An administrative subpoena sent to Havaji in July 2009 warned that export "regulations prohibit most commercial transactions with . . . persons in Iran by U.S. persons unless authorized under OFAC license." Then, in August 2014, Agent Korb testified that she made Hajavi aware of his duties as an exporter during an in-person outreach visit related to the attempted shipment of items to Iran. According to Agent Korb, she specifically advised Hajavi that it was

unlawful to ship U.S. items to the UAE that are then transshipped to Iran, without a license, and that Hajavi was ultimately responsible as the exporter of record. She told Hajavi that "transshipment of items knowingly would be a problem, and that if that were to occur, there could be ramifications for that," including criminal liability. Agent Korb also sent Hajavi various documents and information, including "best practices for preventing transshipment diversion, which discusses . . . making sure that your goods are not diverted into prohibited countries like Iran."

Besides the evidence of warnings the government provided, Hajavi's conduct suggested he knew he was engaging in exportation and reexportation practices that required a license he did not have. For instance, Hajavi told Agent Korb that he was "well aware that he cannot ship to Iran because he was from Iran." He also falsely told Agent Korb that he mostly shipped to Jordan and Saudi Arabia, when he knew that the vast majority of his shipments went to the UAE, and he declined to provide information requested by Agent Korb about a shipment JSH made to a general trading company in a UAE free trade zone. And significantly, the evidence supported a finding that Hajavi and Maghsoudi created false invoices with respect to the purchase of the rotary drill, and made payment through the hawala system, to conceal the nature of the shipment from U.S. authorities.

In short, the evidence was more than sufficient to prove that Hajavi willfully violated his known legal duties not to export or reexport goods to Iran.

Apart from his arguments about the knowledge requirement, Hajavi appears to challenge the sufficiency of the evidence to establish a conspiracy. He contends there was no evidence of communications between him and Maghsoudi that "specifically discussed" the shipment of the drill or other heavy equipment to Iran, other than an "isolated email" from 2012. But "[b]ecause the essential nature of conspiracy is secrecy, a conspiracy conviction may be proved by circumstantial evidence." *United States v. Chandler*, 388 F.3d 796, 806 (11th Cir. 2004). Hajavi fails to develop any argument that the testimony and documents presented at trial, particularly with respect to the rotary drill, were insufficient to establish that "there was a meeting of the minds to commit an unlawful act." *Id.* (quotation marks omitted). And our review of the evidence, and the reasonable inferences that can be drawn from it, reflects ample grounds for the jury's conclusion that Hajavi conspired with Maghsoudi to willfully export and reexport heavy equipment, including the drill, to Iran.

## IV.

For these reasons, we affirm Hajavi's convictions.

**AFFIRMED.**