[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 22-12385

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

BRANDEN TYLER,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 0:21-cr-60227-RS-1

_____

Before LAGOA, BRASHER, and ABUDU, Circuit Judges.

PER CURIAM:

Branden Tyler appeals his convictions for use of one or more unauthorized devices, possession of 15 or more unauthorized access devices, aggravated identity theft, and possession of access device-making equipment. On appeal, Tyler makes several arguments. First, he argues that the government's evidence was insufficient to support his conviction for use of one or more unauthorized devices because its evidence was circumstantial. Second, he argues that there was insufficient evidence to support his aggravated identify theft conviction because there was insufficient evidence that he knew Willard Steele was a real person. Third, he argues that there was insufficient evidence to support his conviction for possession of 15 or more unauthorized devices because there was no evidence presented about the usability of those devices. Fourth, he argues that there was insufficient evidence to support his convictions for possession of 15 or more unauthorized devices and possession of access device-making equipment because there was no evidence that his conduct affected interstate or foreign commerce. And finally, he argues that the district court plainly erred when it gave an aiding and abetting jury instruction.

For the following reasons, we affirm Tyler's convictions.

**I.**

Tyler was charged in a second superseding indictment with: use of one or more unauthorized devices in violation of 18 U.S.C.

§ 1029(a)(2) (Count 1); possession of 15 or more unauthorized access devices in violation of 18 U.S.C. § 1029(a)(3) (Count 2); aggravated identity theft in violation of 18 U.S.C. § 1028(A)(a)(1) (Count 3), and possession of access device-making equipment in violation of 18 U.S.C. § 1029(a)(4) (Count 4). Tyler proceeded to trial on the charges.

At trial, the government called Brian Welshans, an employee at Truist Bank—formerly known as BB&T Bank—who testified to the following. Welshans investigated the activity for two credit cards at BB&T Bank in the name of Willard Steele. He found two credit card applications in Steele's name that listed an 8231 Northwest Court, Lauderhill, Florida, address (the "8231 address"). The credit cards were approved by the bank in Steele's name in May 2020, and between the two cards—one card's account ending in 4177 and the other's ending in 0460—there were purchases and cash advances in excess of $46,000.

Next, the government called Lauderhill Police Department Detective Richard Clarke, who testified to the following. Clarke started his investigation into Tyler after he received a call from Welshans, who told him that there was fraudulent activity associated with the two credit cards in Steele's name. Clarke first contacted Steele, who informed him that he had no idea that either credit card had been opened. He found the bank statements for both credit cards suspicious because the applications were done online, there were multiple purchases and cash advances on them, and there were insufficient funds used to pay off the payments on

the cards.  He noticed that there were Amazon purchases on the credit card for the 0460 account.  He also found the bank statement for the 4177 account suspicious because of the cash advances from ATM machines, the card had been used over its limit, and there were Amazon purchases on that card.  On both cards, there were around $11,467 in Amazon purchases.  Clarke then subpoenaed Amazon, who provided the dates of orders, email addresses, and customer information; this information revealed that Steele was supposed to be the recipient of those items at the 8231 address. The Amazon items purchased included BDI furniture and Wolf Gourmet items.  He also discovered that there was a UPS delivery to that address on July 1, 2020, for five items.

Clarke saw "like" items to the Wolf Gourmet items ordered to another address in Lauderhill—5105 Northwest 75th Avenue (the "5105 address"), which was Tyler's address.  On September 6, 2020, Clarke went to the 8231 address where the Amazon packages were delivered, and the person who resided there—who was not Steele—answered the door and stated he knew Tyler.  After meeting this resident, Clarke identified a citation that was issued to Tyler outside the 8231 address on July 1, 2020.

Clarke then went to the 5105 address, and Tyler answered the door and confirmed that he lived there.  Clarke gave Tyler his business card, which stated an appointment for the next Monday for Clarke to return and meet with Tyler.  Clarke returned on that date, and Tyler again opened the door for him.  Jacqueline Cornwall, Tyler's grandmother and the other resident of the home, took

Clarke to the garage after Clarke showed her pictures of the Amazon items that were ordered. In the garage, Clarke saw similar-in-kind Wolf Gourmet products, two toasters, and an oven that he recognized to be similar to the Amazon products that were supposedly delivered to the 8231 address on July 1, 2020.

Clarke then searched a bedroom that Tyler's family stated was Tyler's room. In this room, Clarke found his business card that he handed to Tyler the first time he went to the residence, prepaid phones that he described as burner phones, a laptop, printers, and a Dyson dryer. In Clarke's experience, prepaid phones indicated fraud, a dryer was often used to ensure that any forms of identification made and printed with ink could dry quickly, and the printers were often used to print cards. Additionally, in the bedroom, officers found credit cards with other individuals' names, a driver's license with Tyler's name that listed the 5105 address, a card-reader, a hologram package, eleven Florida driver's licenses, and a Bank of America checkbook in the name of someone who did not live at the residence. Next to the hologram, Clarke found at least fifty blank plastic cards. He then swiped all the cards found in the bedroom with a card-reader that provided the information of the individuals whose names were on those cards, of which there were at least fifteen or twenty. He also found an "HID" device, which can be used to produce cards such as driver's licenses or bank cards, and a coder reencoder, which can be used to add or erase information on cards that can be purchased on Amazon and that often are used for fraud. He further found a book that was a guide for driver's licenses in each state and blank checks.

6                    Opinion of the Court                    22-12385

Also, during the search, officers found bank statements, receipts, debit card statements, a ticket, a letter from the Internal Revenue Service, and correspondence from the Department of Transportation all in Tyler's name. They found letters addressed to individuals other than Tyler related to identity theft. They found a safe that had $140,000 in hundred-dollar bills, a BMW key and a title for the BMW in Tyler's name with the 5105 address listed, personal identification all belonging to Tyler, postal orders worth $14,000, and jewelry valued at about $160,000. A Rolex watch was also found in the safe, which was purchased under the name Kareem and the cards used to pay for it were consistent with the names on IDs that were found in Tyler's room. There was also an empty box for a Sony A92 camera and lens, which was consistent with the camera from the Amazon purchases ordered from the cards taken out in Steele's name, and the camera was in the Amazon box when it was found. Officers also found two laptops, a Topaz signature pad was found which can be used to make signatures, a HID card reader, two other card readers, and holograms that would go on a Florida driver's license.

Clarke ultimately followed up with the banks for each credit card found. And he identified the people whose driver's licenses were found. On cross-examination, Clarke explained that, during his investigation, he found that three of the places that the cards were used at had video of a person fitting Tyler's description and that a live witness identified Tyler at one of those locations. Clarke also viewed Ring camera footage outside the house of the person receiving the packages and determined it to be Tyler.

The government next called Officer Robert Murray, who testified that he had responded to a suspicious vehicle report on July 1, 2020, near the 8231 address. When Murray arrived, he saw a car parked in the road occupied by Tyler. Tyler told Murray that he was "waiting for something" and handed him his Florida driver's license, and the license photo matched the person Murray saw in the car—Tyler. On the ticket Murray issued to Tyler, Murray listed Tyler's name and his address as the 5105 address.

The government then called Rachel Varela, a Lauderhill Police Department crime scene unit supervisor who worked as a latent fingerprint examiner in Tyler's case. Varela collected Tyler's fingerprints from him and explained that the fingerprints lifted from the MacBook laptop taken from the bedroom matched Tyler's fingerprints.

The government then called Detective Jaynis Tadlock, a digital forensic examiner with the City of Miami Police Department, who testified to the following. Tadlock analyzed the Razor laptop discovered in the search and found that the username for the computer was "Yoda." She recognized a letter addressed to Tyler with the 5105 address from Bank of America that was located on the computer. She also found bank enrollment information for PNC bank and Green Dot on one of the devices she analyzed. Tadlock then read out messages from a phone she analyzed. The messages were from "Andre Johnson" to a username that was a grouping of numbers. Johnson asked this username, "You doing look-ups?"; the username responded, "Yep. $15 a name." Tadlock found a text

message between Johnson and the username that discussed Truth Finder, a website where anyone can purchase a background check on a person. The email for the Truth Finder account was "Yoda305305@gmail." Tadlock also read more messages between Johnson and the username that stated, "I signed this morning. Go bank. Took like 20-minute, LOL. Yep. Just got to go small," and "I just got everything within an hour. I just got another 128K." Another message stated, "Send license number. Send height you want on it. Send the four digits after the 3313, send issue and expiration you want on it"; the response to this message was "generate license." Tadlock also found an email on the laptop for "WillASteele1950@gmail." There were also messages asking how much it was for a Florida ID card.

Tadlock also found on the laptop an application called "Zeus" store, where a person can chat and request to look up names and address information; the application would return social security numbers, birthdays, and other personal information. Tadlock found search results for Milagros Yap, Trad Hamdan, and Cassandra Reyes. And on cross-examination, Tadlock testified that, on one of the cellphones found, she found four pictures of Tyler.

The government also called Yap and Reyes as witnesses. Both Yap and Reyes testified that they did not know Tyler or give him permission to have their identification cards or open credit card accounts in their names. The government also called Steele, who testified that he did not open accounts for the credit cards ending in 4117 and 0460, that he did not know Tyler, that he did not

give anyone permission to open those accounts, and that he did not make any Amazon purchases on those accounts.

Through its witnesses' testimony, the government entered the following evidence. The government entered the BB&T credit card applications and the 4117 account's activity report, which included: (1) purchases from Amazon stating that Amazon was located in Washington; (2) a purchase from Tempur Pedic that listed Kentucky as the postal code; and (3) a purchase from Verizon that had California listed as the location. Both credit card accounts had a North Carolina address listed for BB&T. The government also entered into evidence photos of all the items described above that were found in Tyler's bedroom. The government further entered a consumer report that listed Tyler's name and the 5105 address and the account summary for the 0460 account which showed the purchases and cash withdrawals. And the government entered the text messages between Johnson and the list of numbers username, as testified to by Tadlock.

The government then rested its case, and Tyler moved for judgment of acquittal on Count 3, arguing that the government failed to prove beyond a reasonable doubt that Tyler possessed or used any means of identification. In making this argument, however, Tyler did not assert that the government had failed to establish that Tyler knew Steele was a real person. After hearing the parties' arguments, the district court stated that "defendant's motion for judgment of acquittal as to Counts 1 through 4 will be

denied." After Tyler rested his case, Tyler renewed his motion, adopting the same prior argument, which the court denied.

During trial, the district court asked if there were any objections to the proposed jury instructions. Tyler stated he reviewed the instructions and did not have any objections, and the government sought to clarify that the aiding and abetting instruction was included, which the court stated it was. After the parties rested, the district court read the jury its instructions. Of relevance to this appeal, the following instruction was read to the jury:

> A defendant aids and abets a person if the defendant intentionally joins with the person to commit a crime. A defendant is criminally responsible for the acts of another person if the defendant aids and abets the other person.

> A defendant is only responsible if the defendant willfully directs or authorizes acts of an agent, employee or other associate. But, finding a defendant criminally responsible for the acts of another person requires proof that the defendant intentionally associated with or participated in the crime, not just proof that the defendant was simply present at the scene of a crime or knew about it. In other words, you must find beyond a reasonable doubt that the defendant was a willful participant, not merely a knowing spectator.

The jury found Tyler guilty on all four counts, and he was sentenced to 60 months' imprisonment. This appeal ensued, and we now address Tyler's arguments in turn.

## II.

First, Tyler argues that we should reverse his conviction for Count 1 because the government's evidence was circumstantial and based on mere speculation. The government responds that there was ample evidence to convict Tyler of Count 1 because whether he acted alone or in concert with others, he was personally involved in a fraudulent scheme to use the credit cards to obtain property. And the government argues that there was overwhelming evidence of Tyler's constructive possession of the items found at the 5105 residence.

We review *de novo* whether there was sufficient evidence to support a conviction. *United States v. Jiminez*, 564 F.3d 1280, 1284 (11th Cir. 2009). In reviewing the sufficiency of the evidence, we view the record in the light most favorable to the government, resolving all reasonable inferences in favor of the verdict. *Id.* The evidence will be sufficient to support a conviction if "a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt." *Id.* at 1284–85 (quoting *United States v. Calhoon*, 97 F.3d 518, 523 (11th Cir. 1996)).

The test for sufficiency of the evidence is the same, whether or not the evidence is direct or circumstantial, but where the government relied on circumstantial evidence, reasonable inferences must support the conviction. *United States v. Martin*, 803 F.3d 581, 587 (11th Cir. 2015). We assume that the jury resolved all questions of credibility in a manner supporting the verdict. *Jiminez*, 564 F.3d at 1285. Further, the evidence need not exclude every reasonable

hypothesis of innocence for a reasonable jury to find guilt beyond a reasonable doubt. *United States v. Cruz-Valdez*, 773 F.2d 1541, 1545 (11th Cir. 1985) (en banc). Instead, the jury is free to choose among alternative, reasonable interpretations of the evidence. *United States v. Beach*, 80 F.4th 1245, 1256 (11th Cir. 2023).

An individual is guilty of access device fraud when he "knowingly and with intent to defraud traffics in or uses one or more unauthorized access devices during any one-year period, and by such conduct obtains anything of value aggregating $1,000 or more during that period." 18 U.S.C. § 1029(a)(2). Thus, to convict a defendant for use of unauthorized access devices, "the government must prove that the defendant: (1) 'knowingly' used 'one or more unauthorized access devices,' (2) 'with intent to defraud,' (3) to obtain anything having an aggregate value of '$1,000 or more' during a one-year period, and (4) such use 'affect[ed] interstate or foreign commerce.'" *United States v. Klopf*, 423 F.3d 1228, 1240 (11th Cir. 2005) (quoting § 1029(a)(2)).

"It is well settled that possession of contraband may be constructive as well as actual and may be proven by circumstantial evidence." *United States v. Kincade*, 714 F.2d 1064, 1066 (11th Cir. 1983). To prove actual possession, the government must prove that the defendant had either physical possession of or personal dominion over the thing allegedly possessed. *United States v. Derose*, 74 F.3d 1177, 1185 (11th Cir. 1996). "Constructive possession exists when a defendant has ownership, dominion, or control over an object itself or dominion or control over the premises . . . in which

the object is concealed." *United States v. Leonard*, 138 F.3d 906, 909 (11th Cir. 1998). "Moreover, constructive possession need not be exclusive, but may be shared by others." *Kincade*, 714 F.2d at 1066.

Here, we conclude that the evidence presented at trial was sufficient to find that Tyler used one or more unauthorized devices in violation of § 1029(a)(2). First, based on the evidence, the jury could reasonably conclude that Tyler lived at the 5105 address and had possession over the bedroom where all the evidence was found. *See Leonard*, 138 F.3d at 909. Indeed, Tyler's identification was found in the bedroom's safe, his fingerprint was found on one of the laptops, his grandmother stated that it was his bedroom, and Tyler confirmed to Clarke that he lived at the 5105 address. Therefore, it was reasonable for the jury to conclude that Tyler at least had dominion or control over the bedroom.

There was also sufficient evidence for the jury to reasonably conclude that Tyler committed Count 1. Tyler was seen at the 8231 address on July 1, 2020—the day the Amazon packages purchased from Steele's account were supposed to be delivered. There was also evidence found in Tyler's bedroom of Steele's personal information, as well as the email address of the person who applied for the two credit cards used and text messages found on a cellphone in the room that discussed the same email. Further, there was evidence of Wolf Gourmet items in the 5105 address's garage. And there was also video footage of Tyler at the places the card was used and a witness who stated they saw Tyler at one of

those places.  Accordingly, we conclude that there was sufficient evidence to support this conviction, and we affirm as to this issue.

## III.

Next, Tyler argues that the government failed to present evidence that he knew that the means of identification belonged to a real person beyond a reasonable doubt.  In response, the government argues that Tyler did not argue in the district court that there was insufficient evidence that he knew the cards belonged to a real person, and thus the claim should be reviewed for plain error.  And the government asserts that there was sufficient evidence from which a reasonable jury could conclude that Tyler knew the cards belonged to a real person—Steele.

We typically review challenges to the sufficiency of the evidence *de novo*, but we review unpreserved objections to the sufficiency of evidence only for plain error.  *United States v. Zitron*, 810 F.3d 1253, 1260 (11th Cir. 2016).  Under plain-error review, we ask whether there was (1) error; (2) that is plain; and (3) that affects substantial rights.  *Johnson v. United States*, 520 U.S. 461, 466–67 (1997).  If these three conditions are met, we may exercise our discretion to notice a forfeited error, but only if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.  *Id.* at 467.  To properly preserve a challenge to the sufficiency of the evidence, a defendant must raise the same specific challenges before the district court as he brings on appeal.  *See United States v. Baston*, 818 F.3d 651, 663–64 (11th Cir. 2016).

To prove aggravated identity theft under 18 U.S.C. § 1028A, the government must show that "the defendant: (1) knowingly transferred, possessed, or used; (2) the means of identification of another person; (3) without lawful authority; (4) during and in relation to a felony enumerated in § 1028A(c)." *United States v. Barrington*, 648 F.3d 1178, 1192 (11th Cir. 2011) (quoting *United States v. Hurtado*, 508 F.3d 603, 607 (11th Cir. 2007)).

Here, because Tyler did not move for judgment of acquittal on Count 3 because he did not know Steele was an actual person, we review for plain error. And we conclude that the district court did not commit plain error, as there was sufficient evidence to show that Willard Steele was a real person. For example, a jury could reasonably conclude that, based on the text messages from the phone seized in Tyler's bedroom, Tyler knew he was dealing with real people. Further, BB&T Bank accepted the application for two credit cards in Steele's name. Thus, there is sufficient evidence to support Tyler's conviction for aggravated identity theft, and we affirm as to this issue.

## IV.

Tyler also argues that his conviction for Count 2 should be vacated because there was no evidence about the usability of the alleged unauthorized access devices recovered from his alleged bedroom. The government responds that Tyler failed to make this argument below, meaning that the issue is reviewed for plain error. And the government argues that there was sufficient evidence found in Tyler's bedroom to support the conviction.

For an error to be plain, it must be one that is obvious and clear under current law. *United States v. Madden*, 733 F.3d 1314, 1322 (11th Cir. 2013). An error is not obvious or clear under current law when there is a "lack of controlling authority" or there is "room for doubt about the outcome" of an issue. *United States v. Humphrey*, 164 F.3d 585, 588 (11th Cir. 1999) (quoting *United States v. Thompson*, 82 F.3d 849, 856 (9th Cir. 1996).

An individual is guilty of possession of 15 or more "unauthorized access devices" if he possesses such devices knowingly and with intent to defraud. 18 U.S.C. § 1029(a)(3). An "'access device' means any card, . . . account number, electronic serial number, . . . personal identification number, . . . or other means of account access that can be used, alone or in conjunction with another access device, to obtain money . . . or that can be used to initiate a transfer of funds." *Id*. § 1029(e)(1). An "'unauthorized access' device means any access device that is lost, stolen, expired, revoked, canceled, or obtained with intent to defraud." *Id*. § 1029(e)(3).

Here, we review for plain error because Tyler did not argue in his motion for judgment of acquittal that the government did not prove the usability of the access devices. *Zitron*, 810 F.3d at 1260. And we conclude that the district court did not commit plain error as there was sufficient evidence to support Tyler's conviction for possession of 15 or more unauthorized access devices, as neither the statute nor binding precedent require proof of the usability of the devices. *See Humphrey*, 164 F.3d at 588. We thus affirm as to this issue.

## V.

Tyler also argues that the government failed to prove that his alleged criminal conduct affected interstate or foreign commerce as to Counts 2 and 4.  The government again responds by arguing that plain-error review applies because Tyler did not move for judgment of acquittal on this basis.  The government argues that the evidence shows Tyler used fraudulently obtained credit cards to make Amazon and other purchases, which affected interstate commerce.  The government further argues that the evidence shows Tyler's scheme was broader than just the credit cards, as (1) his bedroom contained device-making equipment and dozens of debit and credit cards and (2) the messages on his phone contained personal identification information of individuals not only in Florida, but other states as well.  Given this, the government asserts that a reasonable jury could conclude that Tyler's device-making equipment was used to generate fraudulent cards that would affect interstate commerce.

Under § 1029(a)(2) and (3), whoever "knowingly and with intent to defraud traffics in or uses one or more unauthorized access devi[c]es during any one-year period, and by such conduct obtains anything of value aggregating $1,000 or more during that period" or "possesses fifteen or more devices which are counterfeit or unauthorized access devices" "shall, if the offense affects interstate commerce or foreign commerce," be punished by a fine or imprisonment for not more than ten years, or both.  § 1029(a)(2)–(3), (c).

In the context of 18 U.S.C. § 1028, we have held that "the government must prove only a minimal nexus with interstate commerce in a § 1028 prosecution to satisfy the in or affects interstate or foreign commerce requirement." *Klopf*, 423 F.3d at 1239. "The defendant need have had only the intent to accomplish acts, which, if successful, would have affected interstate or foreign commerce." *Id.* And the government "is not required to prove that the defendant had knowledge of the interstate commerce nexus when he committed an act in violation of § 1028(a)." *Id.* As to § 1029, in *Klopf*, we explained that, as to "the requirement that the access-device fraud affect interstate or foreign commerce, credit cards generally are issued to applicants by out-of-state financial institutions, and credit-card account numbers travel across state lines, both electronically and by mail." *Id.* at 1240. Because the defendant had made purchases and withdrawals with the fraudulently obtained credit cards, he "engaged in interstate financial transactions." *Id.*

Again reviewing for plain error, we conclude that the district court did not commit plain error on this issue. As in *Klopf*, the jury could reasonably conclude that Tyler's criminal conduct involved in his convictions for possession of 15 or more unauthorized devices and possession of access device-making equipment affected interstate or foreign commerce. For example, evidence showed that Tyler made purchases from the 4117 account from Amazon, listed Amazon as being located in Washington, a purchase from Tempur Pedic had Kentucky listed as the postal code, and a purchase from Verizon had California listed. Further, the evidence showed that the bank Tyler fraudulently obtained the cards from

was based in North Carolina.  Because there is sufficient evidence establishing that Tyler's conduct affected interstate commerce, we affirm as to this issue.

## VI.

Finally, Tyler asserts that the district court plainly erred when it gave an aiding and abetting jury instruction.

Generally, we review the legal accuracy of jury instructions *de novo*.  *United States v. Prather*, 205 F.3d 1265, 1270 (11th Cir. 2000).  But when the defendant makes no specific objection to the jury charge at trial, we review the claim for plain error.  *United States v. Schlei*, 122 F.3d 944, 973 (11th Cir. 1997).  We will not reverse a conviction for a defective jury charge unless we are "left with a substantial and eradicable doubt as to whether the jury was properly guided in its deliberations."  *United States v. Puche*, 350 F.3d 1137, 1148 (11th Cir. 2003) (quoting *McCormick v. Aderholt*, 293 F.3d 1254, 1260 (11th Cir. 2002)).

"When we apply the plain error rule to jury instructions, we do not consider the asserted errors in isolation."  *United States v. Iriele*, 977 F.3d 1155, 1178 (11th Cir. 2020).  Instead, we consider "the totality of the charge as a whole" and determine "whether the potential harm caused by the jury charge has been neutralized by the other instructions given at the trial such that reasonable jurors would not have been misled by the error."  *Id.* (quoting *United States v. Whyte*, 928 F.3d 1317, 1332 (11th Cir. 2019)).  "And even if the unobjected to error retained some prejudicial impact, reversal still may not be warranted."  *Id.* at 1179.  "To show that an instructional

error affected his substantial rights, a defendant must show that the error 'was probably responsible for an incorrect verdict.'" *Id.* (quoting *Whyte*, 928 F.3d at 1332).  If the defendant's guilt would have been clear under the correct instruction, he cannot show plain error.  *Id.*

Aiding and abetting is not a separate crime; rather, "[i]t allows a jury to find one guilty of an offense even though he did not commit all the acts constituting the elements of the substantive crime aided."  *United States v. Martin*, 747 F.2d 1404, 1407 (11th Cir. 1984).  There is no need to refer to aiding and abetting in the indictment because "[t]he aiding and abetting theory is not an essential element of the offense."  *United States v. DePace*, 120 F.3d 233, 236 n.3 (11th Cir. 1997).  Instead, it is a theory "upon which criminal liability may be based."  *United States v. Camacho*, 233 F.3d 1308, 1315 (11th Cir. 2000).  It "is an alternative charge in every count, whether explicit or implicit."  *United States v. Walker*, 621 F.2d 163, 166 (5th Cir. 1980).

Here, the district court did not commit plain error when it gave an aiding and abetting instruction.  The evidence showed that Tyler did not commit all the acts himself in making the licenses and credit cards because of the text messages with the unidentified username who helped Tyler with the lookups and personal information.  And there is no evidence that the aiding and abetting instruction misled the jury in its deliberations or was responsible for an incorrect verdict for any of the counts on which Tyler was charged, especially given there was sufficient evidence to support

22-12385               Opinion of the Court                    21

those convictions.  *See Puche*, 350 F.3d at 1148; *Iriele*, 977 F.3d at 1179.  Accordingly, we affirm as to this issue.

## VII.

For all these reasons, we affirm Tyler's convictions.

**AFFIRMED.**